49 CCPA
**Application of John W. HESSION, Jr.**
**Patent Appeal No. 6589.**

United States Court of Customs
and Patent Appeals.
Dec. 21, 1961.

Barnes, Kisselle, Raisch & Choate, John M. Kisselle, Detroit, Mich. (Alfonse J. D'Amico, Detroit, Mich., of counsel), for appellant.

Clarence W. Moore, Washington, D. C. (S. Wm. Cochran, Washington, D. C., of counsel), for the Commissioner of Patents.

Before WORLEY, Chief Judge, and RICH, MARTIN, and SMITH, Associate Judges, and Judge WILLIAM H. KIRKPATRICK.*

KIRKPATRICK, Judge.

This is an appeal from the decision of the Patent Office Board of Appeals, affirming the rejection by the primary examiner, of all the claims of Hession's application No. 312,951 for a patent on an "Aerosol Apparatus." The construction and operation of the apparatus are not in issue and none of the appealed claims need be reproduced here.

The following facts either are not in dispute or are clearly established:

Hession's application was filed October 3, 1952, and was assigned to Z & W Machine Products Inc., hereafter referred to as Z & W, by an instrument dated October 8, 1952, and duly recorded in the Patent Office. Previously, on August 26, 1952, an application for substantially the same invention was filed by one Frank A. Ziherl, which application was also assigned to Z & W, by an assignment duly recorded.

On December 31, 1954, the Patent Office called upon Z & W to make an election as between Hession and Ziherl and to limit the claims directed to common subject matter to one of those applications. As of January 4, 1955, Isler and Ornstein were the attorneys in charge of both applications and had the duty of taking the necessary steps to comply with Z & W's direction in this matter. According to a statement made by those attorneys in an amendment filed

---

\* United States Senior District Judge for the Eastern District of Pennsylvania, designated to participate in place of Judge O'CONNELL, pursuant to provisions of Section 294(d), Title 28, United States Code.

June 16, 1955, in the Hession application, they ascertained, early in 1955, that Ziherl had drawings dated March 20, 1952, disclosing the subject matter as to which the election was to be made while "In support of Hession's position as a possible first inventor, was his uncorroborated statement that he had numerous sketches and an actual model of the invention which were prior to March 20, 1952, but which, after diligent search and investigation, he was unable to find and produce." It is to be noted that the attorneys' statement that Hession told them that he was unable to produce records "after diligent search" is in conflict with Hession's statement in an affidavit filed in his application to the effect that prior to April 1955 he "made no attempt and had no reason to produce proofs of inventorship." No attempt seems to have been made in the record to reconcile those statements.

On the basis of the investigation by the attorneys an election was made in favor of Ziherl and a patent was granted on his application on March 29, 1955, containing claims which are either identical with or not materially different from Hession's claims involved in the instant appeal.

It was the holding of the examiner and the board that this election is binding on Z & W and precludes the allowance of the appealed claims in the Hession application. That holding, somewhat loosely described by the board as "the ground of double patenting," constitutes the basis of the rejection appealed from.

Hession's application has now been reassigned to him as the result of a series of transactions, the details of which are not important here.

In connection with his appeal to the board Hession presented an elaborate showing of documents and affidavits which, if interpreted most favorably to him, show that he made the invention here in issue as the result of an agreement made with Z & W August 15, 1951, by which he agreed to develop an aerosol device in exchange for a payment of $200 per week and expenses as well as certain payments for royalties; that his application was assigned to Z & W as a result of a further agreement dated October 8, 1952; that he disclosed the invention to Ziherl, who was an officer of Z & W, "long before" the filing of Ziherl's application; that Ziherl improperly appropriated Hession's ideas and embodied them in his application without notifying Hession, and that Hession had no knowledge of that application until the Ziherl patent issued at which time "Upon being confronted with the fraudulent activities resulting in the issuance of the Ziherl patent, Lewis Ziherl (brother of Frank A. Ziherl) and G. W. Walker, officers of Z & W, realized the seriousness of the situation and formally agreed to disclaim the Ziherl patent and reassign the Hession application to applicant (Hession)." This was done, and an offer has also been made to file a disclaimer limiting the term of any patent granted on Hession's application so that it will expire on the original expiration date of the Ziherl patent, thus avoiding any question of extension of monopoly. Also, Ziherl executed an affidavit in which he acknowledged that he was not the inventor of the subject matter set forth in the claims of the patent issued to him.

With reference to the two agreements between Hession and Z & W, since Hession states that Z & W refused to pay the royalties as provided under the *first* agreement but made no mention of the payment of $200 per week and expenses, we assume that such payments were made during the life of this agreement which was in force 14 months less one week.[1] The second agreement among other considerations provided for payments totaling $5,000 to Hession and since Hession in his affidavit did not deny that he received this amount we assume, also, that he received it.

We agree with the solicitor that Hession, now having title to his invention and application by virtue of a reassign-

1. It was terminated by the execution of the second agreement.

ment from Z & W, has only such rights in the premises as Z & W had.

Except for a new ground of rejection raised for the first time by the board, and which we find it unnecessary to consider, the simple question presented by the above rather unusual facts is whether the law would permit Z & W, the common assignee, having elected to pursue the Ziherl application rather than the Hession, which resulted in the issuance of the Ziherl patent, to now require the Patent Office to issue the Hession patent upon the disclaiming of the Ziherl patent.

Therefore, it seems to us that it is incumbent upon this court to decide the issues involved here on this basis only and we cannot properly concern ourselves with the fortunes or misfortunes of Hession who had assigned all his right, title and interest in the invention to Z & W for what we presume he thought was an adequate consideration. Even though there is no reason to believe that Hession was involved in the machinations of Frank Ziherl and the other officers of Z & W, he stands in the shoes of that corporation.

The law pertaining to the irrevocability of election of remedies generally has been stated in 28 C.J.S. Election of Remedies, § 29, page 1101, as follows:

"An election once made between coexisting remedial rights which are inconsistent is not only final and irrevocable and cannot be withdrawn without due consent, even though it has not been acted upon by another to his detriment, but it is also conclusive and constitutes an absolute bar to any action, suit, or proceeding based upon a remedial right inconsistent with that asserted by the election, or to the maintenance of a defense founded on such inconsistent right."

While the election as to whether to obtain a patent on one or the other of two commonly owned applications may not, technically, be an election of remedies, it would appear that the same basic principles should govern in these two types of cases.

The requirement by the Patent Office that a common assignee of two or more applications must eliminate conflicting claims from all but one of them is made in accordance with Patent Office Rule 78 (b), 35 U.S.C.A., and section 1101.01(b) of the Manual of Patent Examining Procedure.[2] The object of requiring such an election is to avoid the anomaly of an interference between applications controlled by a single interest. The requirement transfers the burden of determining priority in such a a case from the Patent Office to the assignee, and the election takes the place of an award of priority in interference. Such an award cannot be set aside on the basis of a subsequent showing, no matter how convincing, that the party to whom priority was awarded was not in fact the first inventor. Blackford v. Wilder, 28 App. D.C. 535; In re Shimer, 69 F.2d 556, 21 CCPA 979, 21 USPQ 161; In re Rhodes, 80 F.2d 525, 23 CCPA 816, 28 USPQ 75; Josserand v. Taylor, 159 F.2d 249, 34 CCPA 824, 72 USPQ 357; In re Gregg, 244 F.2d 316, 44 CCPA 904, 113 USPQ 526.

The question of the revocability of elections by common assignees has been before this and other courts on several occasions.

In the first of these, In re Dunbar, 51 App.D.C. 251, 278 F. 334, 335, the Court of Appeals of the District of Columbia held that a common assignee who had elected to take out a patent on one of its applications was precluded from obtaining a second patent for the same invention on another application. While extention of the monopoly was given as the principal reason for refusing the

---

**2.** The Rules of Practice in the Patent Office, when not inconsistent with the statutes from which they are derived, have the force of law and control the

procedure in that Office. Land v. Dreyer, 155 F.2d 383, 33 CCPA 1108, 69 USPQ 602; Anderson v. Walch, 152 F.2d 975, 33 CCPA 774, 68 USPQ 215.

second patent, the court quoted with approval, the following statement of the Commissioner:

"By taking out the Dyson patent, an election was made on the question of priority between Dyson and Dunbar, and the common assignee is just as much bound by that election as if an interference had been declared and priority decided in favor of Dyson."

The question as to the effect of an election by a common assignee first came before this court in In re Mann and Koppelman, 47 F.2d 370, 371, 18 CCPA 1020, 8 USPQ 381. The decision of the court holding the election to be binding was not based on any extension of monopoly, but on the ground that the election constituted a final determination of priority. This is clear from the following statement in the court's opinion:

"Under this state of facts it is obvious that no interference should be declared between the applications of Koppelman and Cooper and of appellants because there were no adverse interests, the beneficiaries of both applications being the same parties. In so far as both applications covered the same invention, and in so far as the disclosures in each specification show claim by the respective applicants of being the first inventors thereof, since no interference could properly be declared because of lack of adverse interest, it became a matter of election by appellants whether they would take out the patent as original inventors upon their application, or, as assignees of Koppelman and Cooper, upon the application filed by the latter. Having elected to take out a patent upon the application of Koppelman and Cooper, it was in legal effect a concession of priority of invention in Koppelman and Cooper and the same invention disclosed in the two applications * * *."

The question was again considered in In re Howard, 53 F.2d 896, 899, 19 CCPA 759, 11 USPQ 280, in which a common assignee of applications of Howard and Peiler directed to generally similar subject matter had taken out a patent on the latter application. The court reaffirmed the doctrine of the Dunbar and Mann and Koppelman cases in the following language:

"Because of the presence of such common assignee no interference could be declared between the two applications for the reasons stated in the cases of In re Dunbar, 51 App.D.C. 251, 278 F. 334, and In re Mann & Koppelman, 47 F.2d 370, 18 C.C.P.A. (Patents) 1020, and, if appellant's assignee had included in the Peiler patent claim 25 of the application upon which it is based, or any claim corresponding to the claims here in issue, clearly the claims in issue should have been rejected, *even though Howard was in fact the first inventor.*" [Emphasis added.]

While the court found Howard's claims allowable, that action was not based on any modification of the doctrine of election but on the fact that the claims were "for a separate and distinct invention not embraced in the claims of the Peiler patent."

In the case of In re Willoughby, 88 F. 2d 482, 24 CCPA 1033, 33 USPQ 46, the court considered the Howard and Mann and Koppelman cases and reaffirmed the doctrine of election as stated in the latter.

The question of election was again thoroughly considered in In re Fischel et al., 136 F.2d 254, 258, 30 CCPA 1085, 58 USPQ 80. In that case a common assignee of two applications disclosing the same invention elected to take out a patent on one of them. Thereafter it was discovered that the other applicants, Fischel and Rieper were actually the first inventors, and claims to the common invention were inserted in their application, while the patent was reissued to eliminate such claims. It was alleged by appellants that no extension of monopoly would be involved in issuing a patent to Fischel et al., since the previously issued

patent was void *ab initio* because the patentees were not the first inventors of the claimed subject matter.

In its opinion the court made the following statement with respect to the doctrine of election:

"We think the true doctrine of election in patent cases is grounded upon one or more of three fundamental propositions. First, the application of the doctrine prevents two patents being issued for the same invention. Second, it prevents an avoidance of the determination of priority. Third, it prevents an extension of the monopoly."

The court found the first of these grounds to be avoided by the reissue of the patent without claims to the common subject matter, and it may be noted that the same result has been obtained in the instant case by the disclaimer of the Z & W patent.

In considering the second ground, we are faced with the necessity of understanding the phrase "it prevents an avoidance of the determination of priority." Webster's New International Dictionary (1932) gives the following definitions of "avoidance":

" \* \* \* 2. Act of annulling; annulment.

\* \* \* \* \* \*

"5. Act of avoiding or shunning; keeping clear of. \* \* \*."

Although it is possible that the court intended to use "avoidance" as in definition 5, we believe the word was used as in definition 2, and that the entire phrase means that application of the doctrine of election will have the effect of preventing a common assignee from annulling the effect of his choice as to which one of two or more assigned applications is to be issued as a patent.[3] In other words, the court was of the opinion that priority is determined by the elective act of the common assignee and he should not be permitted to annul or avoid that deter-

mination. We believe our interpretation of this phrase finds support in the following statement of the court:

" \* \* \* Both applications were owned by the common assignee. It elected to take out the broad invention in the Fischel and Thiry patent and is bound thereby. It cannot now, in view of the facts of this case, avoid the effect of the election and the consequent waiver of the right to take out the instant subject-matter in the instant application by contending that it was a mistake. To hold with appellants on this phase of the case would be, in our judgment, to lend hopeless confusion to the administration of the patent laws when questions like that at bar are presented to the Patent Office tribunals."

With respect to the third ground, it was found that extension of monopoly would exist since the patent claims in question had constituted a prima facie monopoly until their invalidity was disclosed.

It is clear that *both* the second and third grounds were significant in the Fischel et al. decision. This is apparent from the following statement of the court:

"In the instant case our conclusion is that the proper basis for the application of the doctrine of election by the common assignee of two applications, to wit: extension of monopoly and concession of priority, appears from the instant facts and requires the application of the doctrine."

The most recent rulings by this court on the doctrine of election were In re Keim et al., 229 F.2d 466, 43 CCPA 784, 108 USPQ 330, and In re Ward et al., 236 F.2d 428, 43 CCPA 1007, 111 USPQ 101. In each of those cases, the Dunbar, Mann and Koppelman and Willoughby decisions were cited with approval as supporting the proposition that a com-

3. Black's Law Dictionary, 3d Ed. 1933: AVOIDANCE. A making void, useless, empty, or of no effect; annulling, cancelling; escaping or evading.

mon assignee of two or more applications disclosing the same invention is bound by his election in taking out a patent for that invention on one of them and cannot obtain a second patent for it on the other application. In the Keim et al. case the second patent was allowed, but only on the ground that the invention claimed was patentable over that claimed in the first.

No case has been cited, and we have found none, in which a common assignee, having elected to take out a patent for an invention on one of two or more applications owned by him, has subsequently been held entitled to a patent on another of his applications containing claims to the same invention.

While extension of monopoly is frequently given in the cases above cited as a reason for not granting a second patent, the fact that the assignee's election has the effect of a concession and determination of priority is also consistently given as a reason. Where there are two grounds upon either of which an appellate court may rest its decision, and it adopts both, the ruling on neither is obiter dictum, but each is the judgment of the court and of equal validity with the other. United States v. Title Ins. Co., 265 U.S. 472, 486, 44 S.Ct. 621, 68 L.Ed. 1110. See also Woods v. Interstate Realty Co., 337 U.S. 535, 537, 69 S.Ct. 1235, 93 L.Ed. 1524. The former reason may be said to have been eliminated in the instant case by the disclaimer of the Z & W patent and the offer to limit the term of a patent to Hession, if granted, to expire on the expiration date of the Z & W patent; but the latter reason is still present here.

However, even if it be assumed that under some circumstances an election made by a common assignee is not absolutely irrevocable if no extension of monopoly is involved, we are of the opinion that, when a patent has been issued as the result of such an election, a second patent should not be issued on an application owned by the assignee when the election was made, merely because it has been discovered that the election was in-

correct. It is not necessary to determine whether there is any state of facts which could justify the issuance of a second patent, since we are of the opinion, for the reasons stated below, that the circumstances of the instant case could not under any reasonable rule relating to election by a common assignee be sufficient for that purpose. Entirely apart from any question of irrevocability of election as a matter of law, an assignee who deliberately and knowingly elects to take out a patent on the basis of the application of one who is not the first inventor should not be allowed to obtain a patent on the basis of an application by the first inventor merely because subsequent developments make such a course appear expedient. In the case at bar not only do we not find that Z & W made a mistake but on the contrary we find that Z & W allowed their attorneys to make the election knowing that Ziherl did not invent the device.

Appellant in urging that a mistake was made by Z & W relies largely upon a statement by the lawyer who had charge of the two applications at the time the election was made as to his ignorance of the facts necessary to make a proper decision and his efforts to discover the truth. That approach overlooks the facts that the common assignee was the corporation (Z & W) and not the lawyer and that it was the corporation, not the lawyer, who was the only party vested with the authority and right to make the election. The fact is that there was no mistake on the part of the corporation. If there was any mistake on the part of the lawyer, it was in relying on the information provided him by the corporation through Frank A. Ziherl, one of its officers who was the applicant for the elected patent, and who knew that he had not made the invention. It is not the case of a lawyer acting inadvertently to the detriment of his client.

The knowledge which Z & W in this case had acquired through its agents and officers, or with which it is chargeable by reason of their knowledge, precludes any pretense that it was laboring under

any erroneous belief as to the facts. On the contrary, it is indisputable on this record that it had full knowledge of every circumstance of the entire transaction.

It appears that Z & W approached Hession and induced him to develop the apparatus of the application and that from the date of its first agreement with him (August 15, 1951) he "fully and currently disclosed the nature and results" of his work with Z & W and "particularly to its officers G. W. Walker, Lewis Ziherl and Frank Ziherl," Walker being the president.

Certainly, it cannot be denied that Z & W knew of the date of the application of Frank Ziherl,[4] since it had accepted an assignment of it from him before it was filed. Equally, it had knowledge of the filing of the Hession application, also assigned to it, and of the fact that it was filed over a month later. Nor can there be any doubt that it knew that the two applications were for the same invention. Prior to January 1952 the device was made and successfully tested and fully disclosed to Ziherl by Hession and, by March 1952, a production model had been constructed by the corporation itself under Hession's direction.

A corporation can acquire knowledge or notice only through its officers and agents and is held to know all material facts of which they acquire knowledge in the course of their employment and within the scope of their authority, even though they do not in fact communicate it. 19 C.J.S. Corporations, § 1078, page 613. Plainly, Frank A. Ziherl was acting within his powers as an officer in dealing with Hession. He executed for Z & W the agreement of August 15, 1951, which Z & W acted upon and subsequently expressly acknowledged as binding upon it.

Further, as stated under that agreement, Z & W agreed to pay Hession $200 per week or 5% of the net sale price of each device sold, whichever was greater, for one year, and 5% of the net sale price thereafter; said device being the subject of both applications under consideration here. Under the second agreement he was to be paid $5,000 in three installments. In other words, under the two agreements, we assume Hession was paid some $15,000. In view of these agreements, it is obvious to us that Frank Ziherl, Lewis Ziherl and G. W. Walker knew who invented the device at the time the Ziherl application was filed and at the time that Ziherl assigned his application to the Z & W Corporation.

Under these circumstances, it is difficult to see how it can be said that this common assignee made a mistake [5] when it elected to proceed on the Ziherl patent. And it is extremely significant that not a word of testimony or a particle of evidence has been forthcoming from Z & W or any of its officers that a mistake was made or that the election was not deliberately taken with full knowledge of the facts. The only evidence on the point is what possibly might be derived from the lawyer's "Remarks" (filed in the Patent Office in connection with an amendment of June 16, 1955) leading to the conclusion that Z & W deliberately either misrepresented the situation to its attorney or allowed him to act in ignorance of the material facts.

The element of fraud has been largely discussed in the course of the proceedings in the Patent Office and in the briefs, but it is quite immaterial whether or not the election was made to consummate a fraud. Whatever it may be called, it was not and could not have been a mistake. And if there is fraud it was perpetrated by the party (Z & W) in accepting an assignment from one who did not invent the device, in permitting an election in favor of the Ziherl application, and indirectly asking this court to

---

4. The record does not show what Ziherl's position was except that he was an officer.

5. There is a shade of difference between a mistake and an error. It may be an error for one to enter into a transaction, whether innocent or fraudulent, but if one does so with full knowledge of all material facts, he cannot plead mistake to avoid the consequences.

void the election. It must be remembered it is Z & W's actions which are under consideration here, not Hession's.

It should be noted that Hession had no financial interest whatever in the patent which is the subject of this controversy from the date on which he assigned the application (five days after he had filed it) until November 1955, when it was reassigned to him, some eight months after the Ziherl patent had issued. His compensation under the agreements was based upon cash payments plus a percentage of net sales of the device. The percentage was not contingent upon the ultimate issuance of any patent.

It appears to be argued on behalf of Hession that he had the right to have his name appear on a patent for the invention here involved, regardless of the ownership of the patent. Obviously, any patent issued on the appealed application must bear Hession's name as inventor, but under the terms of the assignment agreements Z & W was under no obligation whatever to obtain a patent on that application. At the time of the election, therefore, Hession had no rights whatever with respect to an application or patent on the invention here involved and accordingly the election could not have deprived him of anything.

There is no evidence that Z & W obtained the contract of October 8, 1952, from Hession and acquired the assignment of the application which placed it in the position of a common assignee of the two applications, by any fraud. Hession in his affidavit does not allege or suggest that the agreement of October 8, 1952, was obtained by any misrepresentation, or that it was unfair or unconscionable, or that he did not get full value for what he sold, or that there existed any confidential relationship which the corporation abused.

The lawyer's "Remarks" above referred to, which have been urged as evidence of mistake, were not sworn to. His statements of fact concerning his inquiry are flatly contradicted by Hession's affidavit, although, in view of the fact that the corporation at all times had full knowledge of all the facts, the matter is not of great importance. It would be an unusual case indeed in which we would accept an unsworn statement rather than a sworn one.

The Patent Office is an administrative tribunal having full jurisdiction in the premises. Courts and other tribunals are frequently asked to vacate or nullify their orders, decrees or actions, but we know of no case where such request was granted without a showing of good cause. It seems to us that it would be hard to find a case presenting less cause for the relief requested than the case at bar. This is not one of those cases where the doubt can be resolved in favor of the applicant since there is no doubt about the law nor the facts.

We find no circumstances here which under any view of the effect of an election could justify the setting aside of the deliberate election made by Z & W in favor of Ziherl and since Hession can have no greater rights than those of Z & W, the decision appealed from was proper and is affirmed.

Affirmed.

WORLEY, Chief Judge (concurring).

While I am not in complete agreement with everything said in the majority opinion, I am satisfied it reaches the only result the record will fairly support.

Hession's contention below, and here, that he invented the aerosol device but lost his rights through fraud, goes to the very heart of this appeal and deserves careful review by this court. That the board gave full and detailed consideration to Hession's proofs before holding them inadequate is evident from the following:

> *"We see no merit in appellant's contention relating to fraudulent action as to the inception of the Ziherl application,* and cannot accept this as a determinative factor here. While there may be other tribunals where a question of fraud could be suitably investigated and evaluated,

as by the exhaustive examination of those parties involved as well as other witnesses, we do not have either the machinery or the authority for any such procedure. Furthermore, even apart from this matter, insofar as the actual record before us is concerned, *we find no positive factual evidence therein tending to establish any fraud, but only what appear to be statements of conclusion by appellant in this direction, presumably based on merely his own personal beliefs.* We note in this connection appellant's comment that prior to the issuance of the Ziherl patent he had no knowledge of the Ziherl application "or that any question of priority of inventorship existed with reference to the subject matter" hereof. It appears, however, that it is stated in the record of this application in the amendatory paper submitted June 16, 1955 presenting claims 14 through 27, that preparatory to the election by Z & W appellant was contacted by their house attorney as to his dates of invention and the evidence in collaboration thereof, and that appellant indicated he was not then able to produce the same after diligent search and investigation. As we see it, the implications of such contact *as to probable conflict with some other disclosure owned by the assignee* should reasonably have been clear to appellant.

"Further, in our treatment of the instant issue, we feel that we should call attention to another matter that has not been mentioned by either the examiner or appellant. *Regardless of all else, the fact remains that there is in existence the Ziherl patent document having an effective date earlier than the filing date of appellant. In accordance with Section 102 of the Patent Statute, this document by its very existence is a bar to appellant unless properly antedated. Yet, even in the face of such bar, we do not find appellant to have*

*submitted any proper factual evidence to denote his invention of the instant subject matter earlier than the effective date of the patent document in question.* This would be a prerequisite even where, as here, there is common claiming, and in view of the nature of the matter before us it would be reasonable that the factual evidence required have the full character specified in Rule 131. *While Ziherl may have submitted an affidavit in this application to the effect that he was not the inventor of the subject matter of the patent, this would not of itself impute earlier inventorship of such subject matter to appellant.* Thus, even if we were in accord with appellant as to his particular contentions advanced in this case (we are not, as pointed out herein), the absence of a showing as noted to establish appellant's inventorship earlier than the effective date of the Ziherl patent would itself preclude any holding in appellant's favor." (Italics supplied.)

In his request for reconsideration, Hession challenged the correctness of those holdings. In its final decision, the board again disposed of Hession's contentions as follows:

"Appellant also contends that we erred in not finding fraud to exist here as alleged by him, on the basis that the facts as pointed out by appellant therein would point up to the fraud that was committed both with respect to Hession as well as the Patent Office. *We see no merit in this contention. In this respect, insofar as the actual record of this application is concerned any such position as to fraud as taken by appellant must be reached only on a basis of mere implication. As we stated in our decision, there is no positive factual evidence in the actual record before us tending to establish any fraud.*

"Appellant additionally urges that our comments in our decision relat-

ing to failure to antedate the effective date of the Ziherl patent document constituted *a new ground of rejection*, and that on this basis the instant application should be remanded to the examiner to permit appellant to present additional evidence to antedate the Ziherl application filing date. *We do not agree with appellant that the comments in question involve any new ground of rejection.* It appears to us that it would stand to reason that in any contention such as here involved of entitlement to a patent because of earlier inventorship than another, a necessary concomitant to such contention would be *an affirmative establishment of the fact of such earlier inventorship.* Hence, in referring to a lack of such prerequisite, our comments would not involve anything in the way of a new ground, but would *clearly relate only to consideration of a fundamental matter inherently part and parcel of appellant's initial basic contention.* Thus, we find no basis for any remand such as mentioned by appellant." (Italics supplied.)

Although the instant record is incomplete in some respects, it still has its share of conflicts and inconsistencies. For example, an initial search for corroboration of Ziherl as the inventor was successful, but "after diligent search and investigation" no corroboration could be found for Hession. Although a later search revealed evidence which allegedly supported Hession, that evidence is more in the nature of an assumption by counsel than actual proof, and certainly would not nullify the corroborating evidence that Ziherl was the inventor. The record is further complicated by two completely contradictory statements by Ziherl as to his inventorship, along with the following from Hession's request for reconsideration below:

"We admit that the statement of Hession under oath conflicts with the statement in the amendment submitted June 16, 1955, by the *then* attorneys for Hession and Z & W that ap-

plicant Hession was contacted as to his dates of invention. * * *"

On such a record, I hardly see how it can be said that the board erred in holding that Hession had failed to properly prove his case.

Another element worthy of consideration is the use to which Ziherl put his patent from its issuance until his disclaimer. The record is silent as to how many, if any, licenses were granted innocent third parties. Hession's patent rights should be crystal clear before this court would be justified in putting him in a position whereby he could subject to legal harassment those who, in good faith, relied on the validity of the Ziherl patent. I submit that this record does not provide that degree of proof.

On this record I am unable to see how Hession's rights would be "extinguished." If anyone "extinguished" those rights it was Hession himself. Long before this controversy was born, he willingly and voluntarily sold, for value, his every right, title, and interest, real or imagined, in and to his aerosol device.

As I understand the present posture of this appeal, the Ziherl patent now belongs in the public domain, or, as put by Hession's counsel, " * * * the Ziherl patent has been disclaimed in its entirety and is a nullity." In other words, the invention, through no fault of Hession, now belongs to the public. But, as I understand the dissenting view, it would be withdrawn and a patent given to Hession until 1972. I am aware of no precedent for such action. Certainly this record will not support such a result.

RICH, Judge (dissenting).

With due respect for the decision of the majority to affirm, my view of this case, and the basic reasons for my strong belief that we should reverse, can be stated in outline form as follows:

*The question:* Can a common assignee's wrong choice between two applications, one by the inventor and the other by one who attempted to misappro-

priate the invention, be changed within three and a half months of making?

*The law:* There is no statutory law or Patent Office rule on the point. The *case law* holds that the choice cannot be changed if the result will be: (a) two outstanding patents for one invention or (b) an extension of monopoly in point of time.

*This case:* Here we have neither (a) nor (b) which makes this an interesting and important case of first impression. The court is not bound by statute, rule, or precedent to decide either for or against Hession, the true inventor who is the appellant here.

*The rejection:* The sole ground of rejection urged by the examiner and affirmed by the Board of Appeals was "double patenting." There will be no double patenting in any form if Hession's patent is granted. In all of the cases relied on by the Patent Office or in the majority opinion[1] there would have been, which is why this is a case of first impression.

*Policy:* Being unfettered by precedent, the court, by this decision, is making law, not merely applying it. Any new law this court makes in deciding cases of first impression should be in the interests of doing justice to the injured, of preserving rather than destroying legal rights, of correcting rather than perpetuating error, and of rectifying wrongdoing.

*Hession:* The appellant has complied with all of the statutory requirements to obtain a patent on an invention of admitted patentability. He has committed no fraud or other wrongful act. He is the admitted *only* (not first) inventor, his assignee has admitted wronging him and has done all within its power to rectify

that wrong, effectively removing, so far as I can see, every legal barrier to the grant of Hession's patent for which it was responsible. Hession, additionally, in pursuit of his tattered, torn and hereby extinguished rights, has offered further sacrifice in the form of terminal disclaimer, as permitted by statute (35 U.S.C. § 253), to avoid the only remaining legal obstacle to patenting.

Contrary to the majority view that "we cannot properly concern ourselves with the fortunes or misfortunes of Hession who had assigned all his right, title and interest in the invention," I think we are very much concerned with the misfortunes of Hession, who is the appellant, and the sole appellant, in this court. If we are not concerned with his rights, with what are we concerned?

Since an understanding of my view as to the correct decision (reversal) in this case depends on an understanding of the facts, which are only summarized in the majority opinion, I repeat here my statement thereof substantially as contained in an opinion, prepared shortly after the hearing, which has failed to retain the support of a majority of the court.

### The Facts

Hession's application stands rejected for "double patenting"[2] in view of a single reference, Frank A. Ziherl's patent No. 2,705,171.

Hession's invention is entitled "Aerosol Apparatus" in his appealed application and "Fog Spray Applicator" in Ziherl's patent. In view of the issues here it is unnecessary to know anything about its details but, by way of background, it is a small electrically powered sprayer for liquids such as insecticides, deodorants, and the like in which a motor-driven blower drives air through one

1. Only for convenience do I use the expression "majority opinion" to refer to Judge Kirkpatrick's opinion, with which only Judge Martin agrees. From the opinions herein it should be evident that the only part of that opinion which surely represents the view of a true majority is the last word thereof, viz. "affirmed."

2. The reason I quote this term is that it has such a variety of meanings that it fails to denote a specific ground of rejection. It is, however, the term, and the only term, used in the examiner's final rejection and in the Examiner's Answer. It is that rejection which was affirmed by the Board of Appeals.

or more venturis to the throats of which liquid is delivered and from which it emerges as a spray or mist in whirling air streams. It is a portable device which may have its own liquid container; or it may be adapted, by use of a suitable dip pipe, to be mounted on top of a drum containing the liquid to be sprayed.

The essential facts, as shown by the record, are hereinafter given in chronological order. They relate primarily to the interrelationships between the inventor, Hession, the reference patentee, Frank A. Ziherl, Z & W Machine Products, Inc. (herein called "Z & W"), of which company Ziherl was an officer, and the attorneys for Z & W who, as will appear, prosecuted Hession's application during a certain period. Z & W is an Ohio corporation and was, during part of the period involved, located in Cleveland, as were its attorneys, moving later to Wickliffe, Ohio, a Cleveland suburb.

The sequence of relevant events began in 1951. As of August 10, 1951, Hession entered into a written agreement with Z & W which recited that he was an engineer skilled in the art of atomizing devices, that he had produced at his own expense prototype models of a venturi type of aerosol sprayer upon which patent applications were being prepared and that he had other types of apparatus in contemplation for producing equivalent results. At that time Hession was living in Darien, Connecticut, which is near New York City. Z & W was in Cleveland and the gist of the agreement was that it was to manufacture sprayers designed and developed by Hession who was to render consulting engineering services for a year at a weekly stipend of $200, receiving reimbursement of his expenses for travel, maintenance, and authorized prototype construction, and a "fee of 5% of the net sales price of such unit or units." His salary was to be applied against any first year royalty. The agreement was rather loosely drawn, but apparently the salary was to be paid for one year. Another provision was that

the parties mutually agreed "that an exclusive license shall be executed by Hession to Z & W for the manufacture, distribution and sale of any or all of these methods," [3] which obviously was intended to mean spraying units. The license and royalty of 5% were apparently to run three years, with escape clauses. This agreement was signed on behalf of Z & W by "Frank Ziherl." It was signed by Hession on "15 Aug. '51," which was five days after its effective date.

An affidavit by Hession, dated March 29, 1956, on file in his application states:

"Prior to January, 1952, I made and successfully tested the aerosol device, shown, described and claimed in the above mentioned application and fully disclosed the same to Frank A. Ziherl. I thereupon proceeded to engineer a production model of the aerosol device for Z and W Machine Products, Inc.

"By March 15, 1952, I had completely engineered an aerosol device acceptable to Z and W Machine Products, Inc. and this device had been constructed by Z and W Machine Products, Inc., under my direction. This device is shown, described and claimed in my above entitled application."

The next event of record in point of time—an event of which Hession, I am convinced, had no knowledge until two and a half years later—was that on August 18, 1952, Frank A. Ziherl executed an assignment of a patent application to Z & W, which application was filed in the Patent Office within a few days on August 26, 1952, Ser. No. 306,331. That application was prepared and filed by a firm of patent lawyers in Washington, D. C. It matured into the Ziherl patent No. 2,705,171 on which Hession's application stands rejected. From some undisclosed date until January 4, 1955, its prosecution appears to have been carried on by a firm of Cleveland attorneys who, on the latter date, turned it over to the

---

3. No such separate license agreement was ever entered into.

attorneys for Z & W, a different Cleveland firm, as will appear.

Returning to Hession, on September 25, 1952, in Darien, Conn., he executed a patent application which had been prepared for him by a firm of New York patent lawyers who filed it in the Patent Office on October 3, 1952. This is the application at bar.

I here interrupt the chronological narrative to remark that it is obvious that the Ziherl application, prepared in Washington, and the Hession application, prepared in New York, were independently written on the basis of a common source of information such as a prototype device or drawings. The resemblances are such that they could result only from use of a common source and the differences are those which would be expected to result from independent preparation of patent applications on the basis of the same disclosure. The two applications describe the same device even to the inclusion of patentably unimportant details of construction.

Hession, on October 8, 1952, in New York, executed a second agreement with Z & W which took the place of the first agreement. Hession's affidavit indicates that there had been some disagreement between the parties about paying royalties under the 1951 agreement on aerosol devices in production by Z & W after the first year during which he received weekly compensation. Be that as it may, the first agreement was wiped out, releases exchanged, and Hession agreed to assign, and by separate instrument did assign to Z & W, his entire interest in the application at bar and the invention described therein. The corporation agreed to pay him $5,000 in three installments over a two year period, to take over the prosecution of his application, and in addition to pay him 1% of its net sales "on all sprayer or fog mist applicators embodying the invention of said patent applications sold within a period of three years from the date of execution of this agreement." The only patent application mentioned in this agreement, signed several weeks after Ziherl filed, is the single Hession

application filed October 3, 1952, including, however, "all divisions, reissues, continuations and extensions" thereof and applications covering improvements thereof, which explains why "applications" in the plural were referred to. As a result of the signing of the new agreement and the separate assignment to be recorded in the Patent Office (which was recorded Oct. 10, 1952), a power of attorney in Hession's then pending application (the one at bar) was given, either by him or by Z & W, to the Cleveland attorneys for Z & W, Isler and Ornstein, who were not yet in charge of the Ziherl application. That power of attorney was accepted by the Patent Office Nov. 28, 1952.

Paragraph 2 of the October 8, 1952 agreement provided, inter alia:

"Hession agrees to cooperate with and assist patent counsel for Z & W in the further prosecution of said pending patent application and any and all applications covering improvements thereon."

At this point silence reigns in the abbreviated record in this court with respect to a two year period during which prosecution of the Hession and Ziherl applications by two separate firms of attorneys was presumably proceeding at a normal rate. This period ended on New Year's eve, December 31, 1954, when the Patent Office mailed an action in the Hession application to Isler and Ornstein withdrawing the allowance of some allowed claims and rejecting all pending claims on the copending Ziherl application, filed 38 days ahead of Hession's, saying that the claims conflicted with Ziherl's claims, that the two applications had a common assignee and that the subject matter "must be placed in one application in the absence of good and sufficient reasons why this may not be done," citing Rule 78(b) and Sections 305 and 1101.01(b) of the Manual of Patent Examining Procedure.

By January 4, 1955, notwithstanding mailing time and the intervening holiday, Isler and Ornstein had obtained a power of attorney in the Ziherl application,

which transferred its prosecution to them from the other Cleveland firm. On March 1, 1955, they filed an amendment in the Hession application cancelling a number of claims with respect to which they stated in the "Remarks":

"Claims 2, 3, 4, 5, 7 and 8 have been cancelled in view of the fact that these claims are not patentably distinguishable over the allowed claims in Ziherl application, Serial No. 306,331, which is owned by the assignee of the present application."

It was the filing of this amendment which constituted the "election" by which, the Patent Office insists, Hession is irrevocably bound. This is the wrong choice sought to be corrected.

Subsequent to this amendment in the Hession application, Ziherl patent No. 2,705,171, now the "double patenting" reference, issued on March 29, 1955.

*Before the Patent Office took any further action on the Hession application,* which was still pending with other claims, the Z & W attorneys filed another amendment on June 15, 1955, stated to be "In further response to the Office action of December 31, 1954 and supplementing the amendment of February 28, 1955," (the one filed March 1, 1955) within three and a half months of the wrong choice, *attempting to undo what had been done* by the latter amendment. The cancelled claims were restored. The Z & W attorney filed "Remarks" containing a lengthy "explanation" which recited some of the foregoing facts and made, inter alia, the following statements:

"6. Upon receipt of the Office action of December 31, 1954, in the Hession application, *the writer* of this supplemental amendment, *William Isler, was confronted with the problem of electing* to place allowed claims common to the Hession and Ziherl applications in one of the two applications, since there was a common assignee of the two applications.

"7. In an effort to arrive at a proper election, the writer of this amendment contacted both Ziherl and Hession. In support of Ziherl's position as the possible first inventor, was the fact that his application was filed approximately five (5) weeks before the filing date of the Hession application, and the further fact that among the drawings which Ziherl had available, there were several drawings dated March 20, 1952, showing the combination which is the subject of the claims in the Ziherl patent. In support of Hession's position as a possible first inventor, was his uncorroborated statement that he had numerous sketches and an actual model of the invention which were prior to March 20, 1952, but which, after diligent search and investigation, he was unable to find or produce.

"8. On the basis of the foregoing evidence, an election was made to place the common claims in the Ziherl application, and the patent was accordingly issued as patent No. 2,705,171.

"9. Approximately six weeks after the issuance of the Ziherl patent, the assignee was notified by Hession that he (Hession) had, upon extending his search and investigation, found the sketches and models referred to in (7) above.

"10. An examination by the writer and others of *Hession's evidence clearly establishes Hession as the first inventor,* and is the basis *for assignee's desire to now rectify the situation by obtaining a patent containing the common claims in Hession's name,* in the manner proposed by this supplemental amendment.

"11. In the event that this amendment is entered, the proposed claims allowed, and a patent issued to Hession, *assignee will agree to disclaim the Ziherl patent in its entirety, and also will agree,* in order to avoid objection to this proposed procedure on the ground that an extension of monopoly will result if a patent is now issued to Hession, *to disclaim that*

terminal portion of the patent issued to Hession which is equivalent to the period between issuance of the Ziherl patent and issuance of a patent to Hession." [All emphasis mine.]

Of course, the attorney who made the "election" [4] knew only what he was told and, in the light of subsequent events and somewhat conflicting evidence, his "Remarks" would appear to be something of an understatement of some events that must have occurred to produce the extraordinary actions of record. Hession has stated by affidavit:

> "Prior to April 1955, I had no knowledge of Ziherl patent No. 2,-705,171, issued on March 29, 1955, *or of any application therefor or that any question of priority of inventorship existed* as to the subject matter of my patent application. I therefore made no attempt, and had no reason, to produce proofs of inventorship." [Emphasis mine.]

The *circumstances* of this case strongly support that statement, the conduct of all parties being consistent *only* with lack of knowledge on Hession's part of Ziherl's application. Hession stated further in his affidavit:

> "Prior to March, 1955, I had been approached by Arthur F. Alders, who was in the business of selling aerosol apparatus [made by Z & W], to make further developments on the aerosol apparatus for Z and W Machine Products, Inc. *Upon learning*

of the issuance of the Ziherl patent, I informed Alders that I would have nothing further to do with Z and W Machine Products, Inc. and I advised Lewis Ziherl and G. W. Walker of Z and W Machine Products, Inc. that I considered unconscionable the fraudulent conduct of Frank A. Ziherl in surreptitiously filing a patent application on the aerosol device that I had invented and developed. I was assured that Z and W Machine Products, Inc. would take the necessary steps to remedy the inadvertent issuance of the Ziherl patent and to obtain a patent on my application." [Emphasis mine.]

Documentary support for the above statement of Hession is in the record in the form of two written agreements, one between Hession and Alders, dated August 27, 1955, and a companion agreement between Hession and Z & W dated September 1, 1955. Each agreement contains a clause reading:

> "WHEREAS, a dispute has arisen between Z & W and Hession, arising out of the issuance to Frank A. Ziherl, as assignor, and to Z & W, as assignee, on March 29, 1955, of United States Letters Patent No. 2,705,-171, as a result of which Hession is unwilling to enter into any new agreement with Z & W to improve the line of Specialty Products; [the contract term used to denote Hession-designed aerosol apparatus

---

4. It is customary to talk of the *assignee* making the "election." It would be more realistic to think in terms of what is really done. The attorneys prosecuting the Hession application received an office action rejecting Hession's claims because they were for the same invention as those in another pending application which was then being prosecuted by another firm. The Patent Office told him there was a common assignee. The real question the attorney had to answer was how to reply to the rejection, which involved several questions: Were the claims to the same invention? Were there two inventors or only one? Was there a common assignee? After getting some answers, and getting control of the

prosecution of the Ziherl application, the attorney then made the mistake of cancelling the rejected claims in the Hession application and issuing the Ziherl patent. The *law* terms that act an "election." It is actually the act of an attorney for two applicants, who have assigned to one assignee, attempting, on the basis of information given to him by his client, to patent the invention to the proper applicant. It is quite unlikely, realistically, that the corporate assignee actually elected to do anything. It was the attorney's choice. I have called it a wrong choice, as it certainly was, so as not to quibble about whether it was a "mistake" or an "error."

manufactured by Z & W for Arthur F. Alders]."

The body of the new Z & W agreement, signed by G. W. Walker as President "in settlement of said dispute," terminated the October 8, 1952, agreement and provided (a) for the diligent prosecution by Z & W of the Hession application, including exhausting all rights of appeal (which is where we are now) by attorneys acceptable to Hession, (b) for the disclaimer of the Ziherl patent, and (c) reassignment of all rights to Hession's invention and application to him. Z & W did, or caused to be done, all of the things agreed to.

This is not the conduct to be expected of either a corporate entity or the officers thereof who knew at all times just what the facts were and just what they were electing (if it can be said realistically that it was the corporation rather than Mr. Isler who "elected") so as to be incapable of making any "mistake," which is a basic premise of the majority's conclusion. If such fictions are indulged in, they should at least be plausible fictions.

Hession later revoked the power of attorney given to the attorneys for Z & W, giving one instead to the attorneys who are prosecuting the instant appeal, explaining this action in his affidavit of March 29, 1956, by saying:

"Recent circumstances have shown me that my interests would best be served by having my own attorneys continue the prosecution of my application."

The attempt made by the Z & W attorneys, before this happened, to "rectify the situation" met, on August 16, 1955, with final rejection by the examiner. His position was simply a repetition of the "double patenting" rejection. As to the proffered disclaimers, he said merely that they "would not avoid the rejection," citing this court's decision in In re Siu, 222 F.2d 267, 42 CCPA 864, 105 USPQ 428, as the only authority for so holding. It is shown later that the case is not in point.

The Z & W attorneys thereupon appealed to the Board of Appeals on February 9, 1956.

Hession's new attorneys thereafter took over and on April 9, 1956, filed their brief before the board and the following additional papers: (1) Hession's affidavit of March 29, 1956, giving his version of the facts, from which I have already quoted; (2) an affidavit executed April 3, 1956, by Frank A. Ziherl in which he said:

"I acknowledge that *I am not the inventor* of the subject matter set forth in the claims of patent No. 2,705,171." [Emphasis mine.]

(3) An *offer* to disclaim signed by Hession March 30, 1956, saying:

"I, John W. Hession, Jr., applicant in the above named application do hereby offer to *disclaim the portion of the term* of any patent issuing on the above named application which extends beyond March 29, 1972." [Emphasis mine.]

(4) An *actual* disclaimer by Z & W as owner of the Ziherl patent, signed by G. W. Walker, President, on April 3, 1956, saying in part:

\* \* \* that it has knowledge that Frank A. Ziherl, the patentee therein, is not the first inventor of the subject matter of the claims of this patent and *acknowledges that John W. Hession, Jr. is the first inventor* thereof and therefore the claims of said letters patent are invalid. Your petitioner, therefore, *hereby disclaims all of the claims of said patent.* [Emphasis mine.]

The offer of terminal disclaimer by Hession, when accepted, would cut back the term of any patent he may be granted to the statutory expiration date of the Ziherl reference patent and the disclaimer of all claims of the latter by Z & W effectively put an end to the Ziherl patent and to any prima facie monopoly secured thereby. As of now there is no patent on Hession's invention. The disclaimer in the Ziherl patent, we note, was published in the Official Gazette of May 8,

1956, and is printed on the copy of that patent in the record here. Since the disclaimer by Z & W is part of the official record, anyone examining it would be put on notice that another patent might be granted to Hession, the true inventor, as it should be.

So much for the facts which, I should like to note in passing, make quite a "showing of good cause," if one be needed, for permitting the common assignee here to reverse its theoretical "election." In this connection I point out that one Frank A. Ziherl, individually, and not acting for or on behalf of the assignee corporation, was the one with the guilty knowledge, who committed the fraud if there was any, and who attempted, as an individual, *to pose as the inventor* of Hession's invention. The majority impute his knowledge to the corporation to show that it knew all and so could not make a "mistake" but from the above it will be seen that as soon as Hession found out about the Ziherl patent he communicated facts to the corporation, its attorney and officers, and that as soon as they really *knew* those facts they took immediate remedial action to undo something that they never would have done had they known them at the time when the wrong choice was made. To the majority who say "it would be hard to find a case presenting less cause for the relief requested than the case at bar," I say "Seek and ye shall find." The majority seems to have been influenced by the idea that Z & W "accepted" an assignment of Ziherl's application. There is, however, nothing of record to show they ever heard of it. They did not sign it. It was the usual form of unilateral assignment.

It appears to me that the attorney, Isler, acting on behalf of Hession but in the employ of Z & W, the common assignee, and making reasonable enquiry as to the facts he needed within the practical limits of the attorney-client relationship, acted reasonably, though perhaps he should have been more suspicious. In practical affairs the attorney for a small corporation does not have the F.B.I. at his disposal, the scope of his investigations are limited by what his client is willing to pay for, and in this case it seems more than likely that he was genuinely misled in his investigations if his contacts with his client were through the individual Frank A. Ziherl who, for personal, not corporate, reasons was probably prejudiced in favor of his own application. In any event, the facts show that whatever action Frank A. Ziherl may have induced was promptly reversed by the other and higher officers when they actually came into possession of the facts the majority imputes to them.

### The "Majority" Opinion

So much for the facts. What of the law on which the majority opinion relies? The "doctrine of election," on which it rests its decision, is to be found, so far as appellate courts are concerned, in a tidy little group of cases. My analysis of them, and of their applicability here, mostly as I wrote it before having the benefit of the light shed by the majority opinion, follows. I still stand on it in preference to the majority's eclectic rationalization. At this point I will mention a few reasons for this preference, which I have not already touched on.

The highly abbreviated selection and summarization of facts as set forth in the majority opinion, I respectfully submit, fails to show what actually happened and has a tendency to lead the reader's mind only toward the decision reached, which is not at all a necessary decision under existing law, as the majority opinion appears to assume.

I find no recognition that the facts of this case make it one of first impression which, as such, is not controlled by prior cases. So far as I have been able to discover, this is the first so-called "election" case in which the applicant has disposed of *both* of the classic reasons for holding elections to be binding, namely, two outstanding patents on one invention and extension of monopoly.

I do not find the majority's emphasis on the fact that Hession got *paid* by Z &

W under his contracts at all persuasive on the issue here. There is one thing he did not sell, because he could not under the law, namely, the right to have his invention patented in the name of someone else and his reputation as an inventor. The Constitution and the patent statutes have as their aim the protection of *inventors* and, while their rights are saleable, they are the applicants and all proceedings are carried on in their names. Hession and his rights are before this court, not Z & W Machine Products, Inc., and its rights.

Neither do I think cases involving issues as to which of two bona fide inventors is "first" in the sense of the patent law have a bearing on this case in which there is admittedly only one inventor, Hession.

The law, as to which the majority has no doubt, is set forth in its opinion as beginning with the "basic principles" of the law of election of remedies as set forth in Corpus Juris Secundum. For one thing, this is not an election of remedies case and I see no resemblance between that rule of procedure and the right to obtain a patent. For another, there is more in C.J.S. than the passage quoted by the majority, including:

> "The binding force of an election cannot be predicated upon mere imputed knowledge." 28 C.J.S. Election of Remedies § 23, p. 1098.

> "It has been said that the doctrine [of election of remedies] is a harsh rule which is not to be extended, and that it is to be applied by the courts with a wide discretion in order that it may not be made an instrument of oppression. Each case involving a question of election of remedies must be governed by its facts." 28 C.J.S. Election of Remedies § 1, pp. 1058, 1059.

It would be repetitious to discuss what the majority says about the real patent law "doctrine of election" since the cases are fully covered in my own ensuing analysis, which is on the basis of the issues in the cases and what the courts did with them, rather than on obiter uttered in rationalizing them.

A quarter of the majority opinion is devoted to an attempt to show that the common assignee did not make a "mistake." A mistake is sought to be subtly distinguished from an error. The argument is that an assignee making a wrong choice between two applications "deliberately and knowingly" should not be allowed to correct it "merely because subsequent developments make such a course appear expedient." If there is anything in this case which could be classified under the head of mere expediency, it has not appeared to me. I can only refer to the above statement of facts for refutation of that notion. Of course Mr. Isler, the attorney who actually made the election, made it deliberately. As to making it knowingly, one has but to look at what happened to appreciate that he *did not know* the facts about inventorship when he elected the Ziherl application because as soon as he found out what they were it came to him as a shock (he had gotten his client an invalid patent) that a fatal mistake had been made and he set about vigorously attempting to correct it. It is a tour de force to avoid this fact by the circuitous route of the imputed-knowledge and no-mistake theories of the majority opinion.

In a brief discussion of the fraud question, on which the appellant unfortunately, I think, largely based his case here, the majority appears to find an element of fraud, if there be any fraud, in the attempt of Z & W to come to this court to void its wrong election. If there be any fraud in this case, it was in the attempt—whoever was responsible for it— to patent Hession's invention in Ziherl's name. It does not appear to me that the corporation, Z & W, had anything to do with that. But certainly I can find no element of fraud in its efforts to rectify that wrong.

### The Law

Except for a new ground of rejection raised for the first time by the board, which I pass for the moment, the simple

question presented by the above rather unusual facts is whether the law permits correction of the admitted error committed in obtaining in the name of Ziherl an invalid patent on Hession's invention.

My analysis of the two board opinions (the second on petition for rehearing, which was denied) and the brief for the Patent Office leads me to the conclusion that the sole basis of the refusal to permit rectification of the error by the means proposed is the "doctrine of election." The only authority ultimately relied on in support of the said doctrine as the Patent Office interprets it is this court's decision in In re Fischel et al., 136 F.2d 254, 258, 30 CCPA 1085, 58 USPQ 80. I have carefully studied the opinion in that case and I have reread the record and briefs therein as well as all the cases there cited and relied on by the Patent Office dealing with election. As a result I have reached the conclusion that the Patent Office in the present case has failed to give any weight to an important factual distinction which exists between this case and the Fischel case and also, it seems to me, rested its case almost entirely on a passage in the Fischel opinion given by it as one of three "fundamental propositions" supporting the "doctrine of election." I shall show why that proposition is no support *for* the doctrine but merely a reiteration of the doctrine itself.

The facts in the Fischel case were that a common assignee had taken out a patent on an application by Fischel and Thiry and was attempting to obtain a patent on the same invention on an application by Fischel and Rieper. The common subject matter had been claimed in claims 7 and 8 of the issued patent and, when met with a "double patenting" rejection, the assignee had reissued the patent to delete those claims. This eliminated the possibility that there would be in existence two patents on the same invention. The claims were still refused, however, on the ground that a second patent would *extend the monop-*

*oly*. As the Examiner's Statement put it:

"To allow the claims in the present application, would be to grant to the assignee of the patent and the application, patent rights to a single invention *for a longer period* that the seventeen years allowed by statute." [My emphasis.]

Appellant then argued that there would be no *extension* of monopoly because claims 7 and 8, removed by reissue, had been invalid *ab initio* by reason of statutory bars so that there had never been a monopoly. The board refused to accept this argument and said that, until defeated, there had been a prima facie monopoly, continuing (136 F.2d at 256, 30 CCPA at 1087):

"Under the circumstances, it seems to us that the doctrine of the case of In re Dunbar (51 App.D.C. 251), 278 F. 334 applies. Cases of similar import are In re Mann et al., 47 F.2d 370 (18 C.C.P.A. 1020), and Haight v. Nell, 1927 C.D. 4."

This court affirmed the rejection, which had been affirmed by the board. In doing so this court said that its holding that the assignee was bound by the election made in taking out the Fischel and Thiry patent was supported by the authorities cited by the board and others which would be considered. This court's opinion then proceeded with a consideration of the three cases mentioned by the board and said (136 F.2d at 257, 258, 30 CCPA at 1089–1092):

"It will be noticed that all three of the above cases were based upon the doctrine of election and that said doctrine in those cases was said to involve the question of *extension of the monopoly*. [Emphasis in original.]

\*   \*   \*   \*   \*   \*

"Appellants' contention with regard to claims 7 and 8 being void *ab initio* makes it necessary for us to consider whether or not there would be an extension of the monop-

oly, under the facts disclosed by the instant record, by allowance of the appealed claims.

\* \* \* \* \* \*

"In concluding that appellants are bound by their assignee's election to take out the broad claims 7 and 8 in the Fischel and Thiry patent under the circumstances stated and are now barred from claiming in the instant application the same \* \* \* subject-matter \* \* \*, we are influenced by a consideration of *the fact that* \* \* \* *to allow the instant claims would be to extend the monopoly* which the assignee has enjoyed in the subject-matter embraced in said claims 7 and 8 in the Fischel and Thiry patent, regardless of the said admitted invalidity. [My emphasis.]

\* \* \* \* \* \*

"We \* \* \* conclude \* \* \* that *to allow the instant claims would be an extension of monopoly.*" [My emphasis.]

It is thus clear beyond question that *extension of monopoly* was a ground, probably the principal ground, of the Fischel decision.

At the same time there seems to have been a second ground which is not so clear. In the course of its opinion the court had said (136 F.2d at 258, 30 CCPA at 1090, 1091):

"We think the true doctrine of election in patent cases is grounded upon one or more of *three fundamental propositions*. First, the application of the doctrine prevents two patents being issued for the same invention. *Second, it prevents an avoidance of the determination of priority.* Third, it prevents an extension of the monopoly.

\* \* \* \* \* \*

"We think the second ground— *avoidance of the determination of priority*—is applicable in the instant case in determining the correctness of applying the doctrine of election. Appellants' assignee, *by taking out*

*the broad claims* to the invention in the patent, *conceded priority* of invention therein disclosed to Fischel and Thiry. *Having made such concession,* it cannot now have a valid patent containing the same subject-matter in another application.

\* \* \* \* \* \*

"In concluding that appellants are bound by their assignee's election \* \* \* we are influenced by a consideration of the fact that the *assignee's conduct conceded priority* of invention to Fischel and Thiry." [Emphasis mine.]

In bringing its opinion to a close the court said, joining both grounds (136 F.2d at 259, 30 CCPA at 1092):

"In the instant case our conclusion is that the proper basis for the application of the doctrine of election by the common assignee of two applications, to wit: *extension of monopoly* and *concession of priority*, appears from the instant facts and requires the application of the doctrine." [Emphasis mine.]

I should now like to review the prior cases from which the court derived the "doctrine of election." In the Fischel case, as here, the actual rejection had been on the ground of "double patenting" which had then been interpreted, in this case by the board and in the Fischel case by the Patent Office Solicitor, to mean that the applicant was barred by the "doctrine of election." In the Fischel case the solicitor told the court in his brief that the only cases which had been found which were in point were "In re Dunbar, 51 App.D.C. 251, 278 F. 334, and the decisions of this Court in In re Mann and Koppelman, 47 F.2d 370, 18 C.C.P.A. 1020 [8 USPQ 381] and in In re Willoughby, 88 F.2d 482, 24 C.C.P.A. 1033 [33 USPQ 46]." This is the same line of authority, plus Fischel, relied on by the board here.

In the Dunbar case the assignee owned two applications, one of which went to issue with narrow claims. The appeal was on the other application, which had

an earlier filing date, having broad claims to the same invention. The Commissioner of Patents held that there had been an election in issuing the patent and that to grant another would *extend the monopoly*. The Court of Appeals agreed. The case was decided in 1922.

Perhaps the earliest case in this court to discuss In re Dunbar is Gowen v. Hendry, 37 F.2d 426, 17 CCPA 789, 4 USPQ 161, in the first year of this court's jurisdiction over Patent Office appeals. The court there said (37 F.2d at 428, 17 CCPA at 793):

> "The principles announced in the decision in the case of In re Dunbar, supra, were intended to prevent so-called 'double patenting,' and *to prevent the extension of the statutory period of patent monopoly.*" [My emphasis.]

In the Mann et al. case a Koppelman and Cooper patent, owned and obtained by the appellants Mann and Koppelman, was cited against them as a reference and it was argued it was not a proper reference. The patent and application covered the same invention. The court said that because of common ownership there could be no interference and taking out the patent "was in legal effect a concession of priority," and that appellant could "not now make any claims upon the application before us that could have been made upon the Koppelman and Cooper disclosure." The court based this holding on In re Dunbar from which it quoted passages referring to election and indicating that it was binding *because of extension of monopoly*.

In In re Willoughby the court had before it the board's affirmance of a rejection by the examiner on the ground that allowance "would obviously result in double patenting *and an extention of the monopoly* which the assignee of the present case already enjoys." [Emphasis mine.] [88 F.2d 483.] The court said that the question posed was whether an assignee, having elected to take out a patent, was entitled to another one. It affirmed the rejection on authority of the Dunbar and Mann et al. cases. The court said it was incumbent upon appellant to clearly point out what *patentable* matter, if any, was contained in the appealed claims not covered by the patent claims and said that "this he has not done to our satisfaction."

In both the Mann et al. and Willoughby cases this court recognized that the "doctrine of election" was not a rule of universal application and that *there are various exceptions to it.* I have taken note of a case neither party has cited, In re Howard, 53 F.2d 896, 19 CCPA 759, 11 USPQ 280, discussed in the Willoughby case, wherein this court refused to apply the doctrine applied in Dunbar and Mann et al. notwithstanding there would be an extension of monopoly, saying its conclusion was "based upon the particular facts in the case at bar." The common assignee which had already obtained a patent was permitted a second patent. The following excerpts are significant (53 F.2d at 899, 19 CCPA at 765):

> "There is nothing in the record to indicate that appellant's assignee elected to prosecute the claims here in issue through the Howard application for the purpose of prolonging its monopoly * * *.
>
> * * * * * *
>
> "We are loath to hold that a party should be denied a patent solely because its grant would extend a monopoly theretofore secured by him, if such extension was due solely to an erroneous decision of the tribunals of the Patent Office, rejecting the claims originally.
>
> "We would observe that we have made diligent search for authorities upon the precise questions here involved, but have found none, and the particular state of facts which gives rise to the controversy here seems never to have arisen before in the Patent Office or in the courts."

The same might be said of the present case, which is one of first impression.

*One outstanding material fact stands out to distinguish this case from all of those relied on below* to support the thesis that a common assignee's election to take a patent on one application is so binding that he can never have a patent on another application for the same invention. *That fact is the offer of terminal disclaimer by Hession which disposes entirely of the issue of extension of monopoly.* The solicitor for the Patent Office tacitly admits that this ground for applying the "doctrine" does not exist by failing to rely on it. Similarly it is tacitly admitted that there will not be two patents on one invention if the appealed application is allowed.

The only point in the Fischel case left for the solicitor to rely on, *and the only one he does rely on,* is the above quoted second ground underlying the "doctrine of election." Based thereon a sort of public interest argument is made. I quote his brief:

> "One of those propositions is that the duty of a common assignee to elect *"prevents an avoidance of the determination of priority."* Once a patent has issued, the public is entitled to assume that the election to take out that patent is final. If an error was made in the election, the public is likewise entitled to assume that the assignee must bear the consequences and no further patent will issue. In effect, such was the holding in In re Fischel et al." [My emphasis.]

I cannot agree with that construction of the Fischel case, in which extension of monopoly would have resulted from allowance.

I will now consider the only portion of the Fischel et al. case opinion which the Patent Office could, or did, rely on; that is the notion expressed as the second of the three "fundamental propositions" which support the "doctrine of election," namely, that "it prevents an avoidance of the determination of priority." I entirely agree with the majority's interpretation of that phrase.

First, what is this "doctrine of election" the majority is applying? It is, simply, a rule of law that a decision to take out a patent on one of two applications claiming the same invention, no matter how errneuos or how the error arose, is binding and *cannot be changed.* Or one may say, the "doctrine" is: elections are binding.

Next, what of the proposition which is supposed to support it? This proposition is that (a) the election amounts to a "determination of priority," which, of course, is pure legal fiction; and (b) that "avoidance," i. e., nullification or changing, of that determination is prevented. In simpler English, the choice made between the two applications *cannot be changed.* But this is the doctrine of election itself!

So, the logic is that elections are binding because elections are binding, or, otherwise stated, the fundamental proposition supporting the doctrine of election is the doctrine of election. I find this singularly unpersuasive reasoning. It amounts to saying that elections are binding merely because the court says so. I think the court should state a better reason. I know of none, however, that is applicable to the facts of this case.

A pseudo-reason runs through some of the obiter dicta which is being relied on, namely, a thought expressed in Mann et al. and thoughtlessly repeated, that an election has the legal effect of a concession of priority. Of course an election, unless and until changed, does have *the effect* of a concession of priority, just as giving a man an anaesthetic has *the effect* of shooting him in the head. Either renders him unconscious. The question, however, which is the very question in this case, is the finality of the thing. A true concession is (on principles inapplicable here) binding on the one who concedes, and saying that an election has the effect of a concession is but another way of saying that it is binding; it is not to give a reason why it should be.

The quotations above from Fischel et al., setting forth the court's expression of

a possible second ground of its decision (the other one being extension of monopoly), clearly show that *there really is no concession by anyone to anybody* and that the whole idea of "concession" is a legal fiction—really little more than an attempt at explaining a legal effect—predicated on *conduct*, viz., the taking out of a patent by the assignee. Tracing the idea back to its apparent source, we find it in the Dunbar opinion's quotation from a Commissioner's opinion (see 47 F.2d 370, 18 CCPA at 1022) to the effect that *in the Dunbar case* (where there would have been both extension of the monopoly and two outstanding patents on the same invention as there would also have been in Mann et al. where Dunbar was being quoted) it was said that the assignee was

> "just as much bound by that election *as if* an interference had been declared [between Dunbar and Dyson] and priority decided in favor of Dyson." [My emphasis.]

In Mann et al. the opinion gave this thought a twist in a dictum to the effect that the election "was in legal effect a *concession* of priority." [My emphasis.] And now, in the majority opinion herein it gets a further twist and we are told that the ground of decision in the Mann et al. case was "that the election constituted a *final determination* of priority." [My emphasis.] The majority opinion fails to note, however, that in Mann et al. the court not only cited and relied on two extension of monopoly cases, In re Dunbar and Haight v. Nell, 1927 C.D. 4, quoted the passage from the Dunbar case stating, as a reason for considering an election to be binding, that if "repudiat[ed] * * * monopoly would obviously be extended." It also overlooks the passage, above quoted from Fischel et al., which states not only that the Mann et al. and earlier decisions were based on the doctrine of election, but that that doctrine was based on *extension of monopoly*, this court having italicized that clause for emphasis. To me, it is a signal distortion of the law to say that the Mann et al. decision was not based on extension of monopoly. It

was present in the facts of the case and this court in Fischel et al. (136 F.2d 254, 30 CCPA p. 1089) said just the opposite while four of the five judges who decided the Mann et al. case were still on the court, including the author of the opinion.

It is interesting to examine the record and briefs in Mann et al. and to find that there is not one word in them about either "election" or "concession of priority." Since these papers are not published, I think it may shed a little light on this field of law to state that the gist of the Patent Office case in Mann et al. is expressed in the following three short paragraphs from its 5-page brief:

> "Appellants raise the point that this application has an earlier filing date than the filing date of their patent. If there were two inventions involved, a different situation would be presented. It is submitted, however, that a comparison of the patent and application claims will show that there is but one invention in the two cases.
>
> \*    \*    \*    \*    \*    \*
>
> "If an assignee is the owner of a plurality of applications each containing the same invention, after he has taken out his patent on one of his applications he would not be allowed to obtain a patent on any of his other applications for the same invention.
>
> "It was never intended that the Patent Office should grant two patents to the same party for the same invention."

The appellants' argument was that their patent and their application were for patentably different subject matter and their brief states the sole issue to be whether their patent was an anticipation. The board so treated the case, deciding it in a two page opinion holding merely that the application claims did not distinguish from the reference. The court's self-involvement in theories of election and hypothetical concessions of priority appears to have been gratuitous and is

somewhat difficult to understand. They were certainly not briefed or considered by the board. It seems to have been embroidering upon the Dunbar case opinion.

The argument that the public has an interest in *preventing* correction of the error made in this case does not impress me favorably. It seems to be out of tune with patent law as manifest in the statutes. An entire chapter of Title 35 U.S.C., is devoted to "Amendment and Correction of Patents," Chapter 25, Secs. 251–256. Furthermore, the 1952 Act liberalized the law there set forth in several particulars with respect to reissue, correction, and particularly disclaimer. For the first time provision was made by statute for disclaiming a "terminal part of the term" of a patent, the very provision appellant seeks to avail himself of here. That provision did not exist until nearly ten years after the Fischel case was decided. Its specific purpose, apparent on its face, is to enable patentees *to avoid extension of monopoly in "double patenting" situations* which had theretofore resulted in the invalidating of patents or the prevention of their issuance because, if issued, they would be invalid on account of extension of monopoly. It might also be mentioned as an indication of a liberal trend on the part of the legislature that Sec. 255 permitting applicants to correct certain errors was entirely new, that Sec. 251 made it explicit that reissue could be had if the patentee claimed *less* than he was entitled to, as well as when he claimed too much, and that "error without any deceptive intention" was sufficient reason for reissue, rather than the prior requirement that there be "inadvertence, accident, or mistake." (See R.S. § 4916). Also the law invalidating an entire patent for failure promptly to disclaim a claim known to be invalid was done away with by deleting the provision in the old disclaimer law, R.S. § 4922, which brought about that result. Sec. 256 was an entirely new section liberalizing the practice with respect to changing the names of inventors on patent applications. All

of this is the antithesis of a public policy preventing the correction of mistakes, including mistakes in issued patents.

While no arbitrary rule can be enunciated, the application of which will constitute a decisive test for all cases, it is my view that Z & W, as assignee, was entitled to correct the error it made in causing the Ziherl patent to issue. It did not in fact possess the right to obtain a valid patent on the Ziherl application, because Ziherl did not make the invention, and Z & W mistook its proper course. It discovered this fact promptly after issuance of the patent and moved promptly to correct the error after discovery of the facts. Z & W has already eradicated the Ziherl patent by total disclaimer and the prima facie monopoly it represented, thereby meeting the first reason given in Fischel for making an election binding. Through Hession's offer of record to make terminal disclaimer if he gets a patent, the possibility of extension of monopoly has been eliminated. The second so-called "reason," prevention of avoidance of an imaginary determination of "priority," I find wholly unpersuasive on the issue of whether or not the election is binding.

So far as public interest is concerned, I believe the public has an interest in the correction of error, where it has in no way been damaged, which is superior to whatever interest it may have in mere uniformity of "doctrine" or in mere administrative convenience. No injury to the public has been shown.

The examiner and the board additionally cited In re Siu, 222 F.2d 267, 42 CCPA 864, 105 USPQ 428, to support the contention that Hession's terminal disclaimer, and Ziherl's disclaimer as well, availed him nothing. In the Siu case, although the reference was a patent owned by a common assignee and a terminal disclaimer was submitted, thus giving a semblance of similarity to this case, the ground of rejection was that there was only a single invention on which two patents could not be issued, Underwood v. Gerber, 149 U.S. 224, 13 S.Ct. 854, 37 L.Ed. 710, having been

relied on by the Patent Office. Obviously a *terminal* disclaimer could not avoid that rejection. There would still be two outstanding patents on a single invention. The solicitor has not relied on the Siu case and I do not regard it as in point. Nothing was there done, as has been done here, to eliminate the patent which the common assignee had already obtained. In the Siu case there was no discussion of any "election."

For the foregoing reasons I would reverse the rejection grounded on "double patenting" or on the "doctrine of election," whichever is the basis intended in the Patent Office, and hold that Z & W, the assignee of the Hession application, was entitled to rectify the error made by the means adopted. Hession, holding title to the invention from Z & W is entitled to the benefit of this decision.

So much for my views on the "doctrine of election" and whether this court has ever held that an election is binding under the conditions prevailing in this case. The majority says "there is no doubt about the law" and concludes that the election is binding. Would that it were so clear! My study of the law of the "doctrine of election" leaves me in some doubt which I resolve on the basis of certain basic principles with the result that in this case I see no reason, and have been shown none, why the wrong choice made against the Hession application should not be subject to correction.

If that point be not held against Hession, another rejection is outstanding against him. It is not inconceivable that there could be a rehearing in this case and because of the possibility of such an event, I here repeat what I said in my earlier unaccepted opinion on that point, so that my views may be known.

The Board's Statutory Bar Rejection

In its first opinion the board said,

"* * * we feel that we should call attention to another matter that has not been mentioned by either the examiner or the appel-

lant. Regardless of all else, the fact remains that there is in existence the Ziherl patent document having an effective [filing] date earlier than the filing date of appellant. In accordance with Section 102 of the Patent Statute, this document by its very existence is a bar to appellant unless properly antedated."

The board had reference to 35 U.S.C. § 102(e) reading:

"A person shall be entitled to a patent unless—

* * * * * *

"(e) the invention was described in a patent granted on an application for patent by another filed in the United States *before the invention thereof by the applicant* for patent, * * *." [Emphasis mine.]

The board expressed the further view that Hession should produce "factual evidence to denote his invention of the instant subject matter earlier than the effective date of the patent document" which should "have the full character specified in Rule 131." The board then said, "the absence of a showing as noted to establish appellant's inventorship earlier than the effective date of the Ziherl patent would itself preclude any holding in appellant's favor."

By request for reconsideration, Hession in effect asserted that this was a new ground of rejection and that he was entitled to have the case remanded to the examiner so he could show by satisfactory evidence that he made his invention before Ziherl's filing date.

In its opinion denying reconsideration the board also refused to remand, insisting that it had not presented a new ground of rejection, saying:

"We do not agree with appellant that the comments in question involve any new ground of rejection. It appears to us that it would stand to reason that in any contention such as here involved of entitlement to a patent because of *earlier*

*inventorship than another,* a necessary concomitant to such contention would be an affirmative establishment of the fact of such earlier inventorship. Hence, in referring to a lack of such prerequisite, our comments would not involve anything in the way of a new ground, but would clearly relate only to consideration of a fundamental matter inherently part and parcel of appellant's initial basic contention." [Emphasis mine.]

I cannot agree. Assuming disposition of the ground of rejection that came up to the board from the examiner, I find that we are still left with the proposition that the Ziherl patent "document" is a statutory bar to the grant of a patent to Hession under section 102(e). This ground must, therefore, have originated with the board and perforce was a new ground. In any event, it must be disposed of. The question is, how?

Fundamentally, all we are concerned with is whether Hession's invention was made before the filing date of the Ziherl patent. Before Ziherl filed had Hession "invented" his sprayer as claimed? If the answer is in the affirmative, section 102(e) is no obstacle.

On the record before us in this case I would have no hesitation in saying that Hession made his invention before Ziherl filed. I am satisfied that Ziherl did not make the invention at all and that the invention he disclosed to his solicitors for the preparation of his application was Hession's invention. What further proof is required that Hession made the invention before Ziherl's application was filed? The board's doubt in the matter would seem to stem from its error in regarding the question here as one of "priority," in the strict sense of that word, instead of a question of originality, which is what we actually have before us. There is in this case no question of "earlier inventorship," to use the board's phrase. The evidence of record overcomes Ziherl's filing date.[5]

If I read the majority opinion correctly, four-fifths of the judges of this court, at least, have been convinced by the record made by Hession herein that he made the invention[6] and that Ziherl derived it from him. This would be enough to win an interference and no more is required to overcome the Ziherl patent "document" as a bar under 35 U.S.C. § 102(e).

I see no valid reason to refuse a patent to Hession.

SMITH, Judge (dissenting).

To the extent this case involves what has been termed "the doctrine of election," I agree with the dissenting opinion written by Judge Rich. In my opinion, however, this case does not present an issue of "election,"[1] but presents in-

---

5. If it be argued that Hession is not shown to have *completed* his invention by reduction to practice *prior* to Ziherl's filing date, the answer would be that in an originality case such as we have here, it has long been settled that a reduction to practice by the one who derived the invention from another inures to the benefit of the one who made the disclosure and Ziherl's application would be a constructive reduction to practice of Hession's invention as of its filing date. Therefore, that application would not show *prior* invention. Underwood's Interference Practice (1928), page 224.

6. In fact, this finding and knowledge of the fact so found by the corporation is

one of the underlying bases for the holding of the majority opinion that no "mistake" was made.

1. The majority refers to the "doctrine of election," and finds that Z & W made a binding and conclusive "election." On this basis, the majority justifies the improper issuance of the patent to Ziherl even though by his own present admission he was not the inventor of the disclosed subject matter. I do not think that the "election" made hereby Z & W can be equated to an "election of remedies." An important requirement of the doctrine of "election of remedies" which must be present before an election is irrevocable or binding is that the party

stead a more fundamental issue, namely, to what extent can a rule of administrative expediency such as Patent Office Rule 78(b) be employed by the Commissioner of Patents to avoid the duties expressly imposed on him by 35 U.S.C. § 135. The more precise issue here being whether under the circumstances of this case the Commissioner of Patents, by the promulgation and administrative use of Rule 78(b), may deprive an applicant of the notice to which he is entitled under 35 U.S.C. § 135.

While this issue was not dealt with below, it is the duty of this court under 5 U.S.C. § 1009, 5 U.S.C.A. § 1009,[2] to consider it and to judicially re-examine and review the fundamental authority under which the Commissioner of Patents acted in this case. The issue is present in the record and is raised in general terms by reason of appeal #1.[3] I find this sufficient to warrant consideration of the question as to the authority of the Commissioner of Patents, in this case, to apply section 1101.01(b) of the Manual of Patent Examining Procedure and to compel a common assignee to make an "election" under Patent Office Rule 78(b).

In summary, the pertinent facts are:

(1) Appellant, Hession, invented an "aerosol apparatus" which he disclosed to one Frank Ziherl, who misapropriated the invention and filed an application for a patent in his name as inventor. U. S. Letters Patent No. 2,705,171 issued March 29, 1955 on this application in the name of Ziherl as the patentee.

(2) Hession, after disclosure of his invention to Ziherl but before issuance of the Ziherl patent, filed his own application for a patent.

(3) Ziherl and Hession each assigned their pending patent applications to Z & W Machine Products, Inc., hereafter called "Z & W."

(4) The Patent Office, acting under its Rule 78(b), required Z & W as the common assignee to place in one application the conflicting claims in the separate Ziherl and Hession applications.

(5) Z & W, *without the knowledge or consent of Hession*, placed the conflicting claims in the Ziherl application and

making the election had full knowledge of the facts when the election was made.

"While * * * there have been many divergent views of the question of election of remedies, we are aware of no application of the rule which does not include the requirement that the litigant have full knowledge of the facts when the election was made." Banner Mfg. Co. v. U. S., 112 F.Supp. 365, 367, 125 Ct.Cl. 384.

On the record here, Z & W's "election" was made without knowledge that Hession rather than Ziherl was the true inventor. Actually, if the now known facts had been known to Z & W at the time of the alleged "election," there would have been no basis for it, since only Hession and not Ziherl was an "inventor" who was entitled to apply for the patent. At best, the doctrine of election is a harsh rule which in my opinion is not applicable to the facts of this case. See Albert v. Martin Custom Tire Co., 2 Cir., 116 F.2d 962 and Cook v. Commercial Casualty Ins. Co., 4 Cir., 160 F.2d 490.

2. Par. (e) of 5 U.S.C. § 1009, 5 U.S.C.A. § 1009(e) reads in pertinent part as follows·

"(e) *Scope of review.*

"So far as necessary to decision and where presented the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of any agency action. It shall * * * (B) *hold unlawful and set aside agency action,* findings, and conclusions found to be * * * (3) *in excess of statutory jurisdiction, authority,* or limitations, or short of statutory rights; (4) *without observance of procedure required by law;* * * *. In making the foregoing determinations the court shall review the whole record or such portions thereof as may be cited by any party, and due account shall be taken of the rule of prejudicial error." (June 11, 1946, c. 324, § 10, 60 Stat. 243.) [Emphasis added.]

3. Reason of appeal #1 reads:

"The Board of Appeals erred in holding that the election previously made by appellant's assignee to issue Ziherl patent No. 2,705,171 is binding on appellant."

cancelled them from the Hession application.

(6) Hession first discovered what Z & W had done after the Ziherl patent issued.

(7) Upon Hession's protest to Z & W, it reassigned the pending Hession application to him; Ziherl stated under oath that he was not the inventor of the subject matter disclosed in patent No. 2,705,171; and all claims of the Ziherl patent were disclaimed.

Hession here appeals the Patent Office rejection of his application for "double patenting" [4] in view of the Ziherl patent No. 2,705,171 and challenges the so-called "election" under Rule 78(b) which was made by Z & W as the common assignee of Hession and Ziherl.

There is no specific statutory authority for Patent Office Rule 78(b). It was promulgated by the Commissioner of Patents under the general authority conferred on him by 35 U.S.C. § 6, to establish regulations "not inconsistent with law" for the conduct of proceedings in the Patent Office.

There is no question but that Rule 78(b) was used here to determine priority [5] between conflicting applications in a manner other than that provided in 35 U.S.C. § 135. As stated by the Board of Appeals in its opinion of April 15, 1958:

"It is well settled that it is the general rule that an election by a common assignee of a number of conflicting applications of different inventors, in favor of issue of one of them, *is in legal effect a concession of priority* to the inventor of the elected application, *which is binding and cannot later be repudiated* or shifted to another of said applications." [Emphasis added.]

The majority opinion adopts the substance of the Board's opinion when, in referring to the effect of Patent Office Rule 78(b) and section 1101.01(b) of the Manual of Patent Examining Procedure, it states:

"The requirement *transfers the burden of determining priority in such a case from the Patent Office to the assignee,* and the *election takes the place of an award of priority in interference.*" [6] [Emphasis added.]

Rule 78(b) thus applied allows the Commissioner of Patents to avoid the express duty when Congress imposed on him in the clear and explicit language of 35 U.S.C. § 135 that "whenever an application is made for a patent which, in the opinion of the Commissioner, would interfere with any pending application, * * * he shall give notice thereof to the applicants * * *." [Emphasis added.]

Rule 78(b) as here used, unlawfully shifts to a common assignee the burden of determining priority between conflicting applications. 35 U.S.C. § 135 places this burden on the Commissioner of Patents. Thus, as soon as conflicting claims were found in the Ziherl and Hession applications, such claims must be retained in both the Ziherl and Hession applications in order to permit the Commissioner to discharge the statutory duties imposed on him by 35 U.S.C. § 135.

The real issue at the time of the "election" improperly imposed on Z & W by

4. While the prior decisions, as pointed out in Judge Rich's dissenting opinion, frequently have justified an election under Rule 78(b) for the reason that it will prevent the issuance of more than one patent on an invention, this reason, as he also points out, is no longer a valid one in view of the statutory changes made in section 135 of the Patent Act of 1952 (35 U.S.C. § 135).

5. The term "priority" as here used includes both true "priority" or who is the first inventor in law as well as "originality," or which of two applicants was the true inventor.

6. The majority also finds that under Rule 78(b), the common assignee "was the only party vested with the authority and right to make the election." The majority, however, does not discuss nor comment on what seems to me to be the inconsistent requirement of Patent Office Rule 262(c) that "a concession of priority may not be made by an assignee."

the Patent Office under Rule 78(b) was the issue of priority of invention between the rival applicants, Ziherl and Hession. The language of 35 U.S.C. § 135 permits no equivocation as to the duties of the Commissioner under these circumstances. The statute directs that the Commissioner in such a situation "shall" give notice to the applicants. No such notice was given here.

Every applicant for a patent is entitled to rely upon the protection afforded by the notice expressly provided in 35 U.S.C. § 135.[7] The requirement imposed on Z & W under Rule 78(b) to make an "election" does not satisfy the notice requirements of 35 U.S.C. § 135. Z & W, as a common assignee, is *not* an "applicant" under the law. Section 135 in this context refers solely to "applicants." An assignee is not a party to an interference proceeding when it is declared.[8]

The failure of the examiner to subordinate Rule 78(b) to the controlling provisions of 35 U.S.C. § 135 and thereafter to proceed under the appropriate Patent Office Rules presumably promulgated to give administrative effect to 35 U.S.C. § 135, has deprived Hession of the notice which the statute expressly requires "shall" be given to him by the Commissioner and has resulted in the issuance of an invalid patent to Ziherl.[9]

It is a matter of paramount public importance that patents be issued only to inventors and, where there is an issue as to priority, to grant such patent only to the one who is legally the first to have made the invention. Congress in 35 U.S.C. § 135 reflects its concern with this problem and by direct and mandatory language has instructed the Commissioner what he "shall" do. There is nothing in 35 U.S.C. § 135 which excepts from its scope interfering applications which happen to be owned by a common assignee.[10] As here applied, Rule 78(b) contradicts the plain language of 35 U.S.C. § 135 and adds thereto a proviso that in the case of interfering applications owned by a common assignee, the notice to the interfering *applicants* provided in 35 U.S.C. § 135 no longer applies since in this case, the common assignee is to determine the issue of priority.

While I agree with the majority that the rules of the Patent Office have the force and effect of law, I do not agree that this is the case when as here they are inconsistent with the statute. As here applied by the majority, Rule 78(b) is clearly inconsistent with the explicit language of 35 U.S.C. § 135. While the decision of the majority purports to be based on judicial sanction given to a long usage of the rule by the Patent Office, I do not feel that this is a valid reason for sanctioning such use of a Patent Office rule.

7. As pointed out by the majority, recorded assignments of applications are deemed to be absolute assignments since the Patent Office cannot be expected to investigate the assignments and the agreements which may underlie them. In a priority determination under 35 U.S.C. § 135, the *applicants* are directly notified of the interference and thus an opportunity is afforded the *applicants* to protect their interests independently of the *assignee* and to be heard on all other pertinent issues which may be properly raised and determined. See Patent Office Rules 209, 203, and 207.

8. Once an interference is declared, an assignee may become a party to it only in limited cases and then only after per-

mission is sought and granted, as provided in Rule 242.

9. Article 1, Section 8 of the Constitution gives Congress the power to grant patent rights only to "Inventors." Since Ziherl, by his own admission, is not an "inventor," the application of Rule 78 (b) here has resulted also in the issuance of the patent to a non-inventor, Ziherl, in violation of the Constitutional provision.

10. For this reason I am unable to see, as does the majority, anything "anomalous" in the declaration of an interference under 35 U.S.C. § 135 between rival *applicants* merely because, at the time the conflict is determined to exist, title to the applications happens to be held by a common assignee.

"The Commissioner justifies his decision by the rules of the Patent Office and a long practice under them. If there is inconsistency between the rules and statute, the latter must prevail." Steinmetz v. Allen, 192 U.S. 543, 565, 24 S.Ct. 416, 423, 48 L.Ed. 555.

The use of Rule 78(b), under the circumstances of this case as sanctioned by the majority, makes a mockery of 35 U.S.C. § 135 and nullifies the safeguards to applicants which are found in Rule 262.[11] Section 135 and Rule 262 recognize and protect the dominant public interest in assuring that the proper inventor is named as the patentee. They also protect the very real personal interest of each inventor in being named as the patentee in a patent issued on his invention.[12]

When a common assignee is required to make an "election" under Rule 78(b) as here applied, the safeguards to the public and to the applicants found in 35 U.S.C. § 135 and in Rule 262 are indeed effectively nullified.

The Ziherl patent was in the application stage when it was found to be in conflict with the Hession application. Until the Commissioner had notified Hession and Ziherl as the rival applicants, no determination of priority could legally be made. Until such a determination was made, there was no authority to issue the Ziherl patent. Having failed to perform his statutory duty, the Commissioner cannot now avoid responsibility therefor by having improperly issued the Ziherl patent and then using it, as was here done, to reject the Hession application on the ground of "double patenting."

For the foregoing reasons, I would reverse the decision of the Board and allow the rejected claims to Hession.

11. Further safeguards against actions of an assignee adverse to an applicant are found in Rule 262(a) and (b) which specifically requires that the "written disclaimer *or concession of priority*, or abandonment of the invention" must be *"signed by the inventor in person* with the written consent of the assignee when there has been an assignment." [Emphasis added.]

12. In writing in the Spring 1961 issue of The Patent, Trademark, and Copyright Journal of Research and Education, The George Washington University, on "The Patent System from an Inventor's Point of View," Carl E. Barnes, Vice President, Research, Minnesota Mining and Manufacturing Company, makes these significant observations:

"Although I am no longer directly concerned with inventing, time was when I spent all my waking hours in search of new products and new ideas. I found then that I was strongly motivated to try new experiments in the hope of discovering something patentable; I still believe this is a tremendous incentive.

"For many technical people the first patent is still a-borning, and I'm sure these people have been exposed to the idea from one source or another that as long as they have to assign their patents to the company for whom they work, part of the incentive is gone. Let's get this one straight. First and foremost, *don't ever lose sight of the fact that a United States patent is issued in the inventor's name, and although he assigns the rights to his company, his name will forever be attached to that patent.* [Emphasis added.] This is his indisputable claim to being an accomplished inventor, and *no one*—no company—can take this away from him. The more patents that bear his name, regardless of what he did with the rights to them, the greater is his standing in the technological community. Issued patents are tangible evidence of his worth as an inventor, and they are perfectly salable in his quest for a job wherever he goes. They will have an effect on his salary." (p. 68).