UNITED STATES *v.* TITLE INSURANCE & TRUST COMPANY ET AL.

APPEAL FROM THE CIRCUIT COURT OF APPEALS FOR THE NINTH CIRCUIT.

No. 358.　Argued February 28, 1924.—Decided June 9, 1924.

1. Where there are two grounds upon either of which an appellate court may rest its decision, and it adopts both, the ruling on neither is *obiter dictum,* but each is the judgment of the court, and of equal validity.　P. 486.
2. A long-standing decision of a doubtful question, which has become a rule of property affecting many land titles, should not be disturbed.　*Id.*
3. The United States sued to establish a perpetual right of Mission Indians to use, occupy and enjoy part of a confirmed Mexican land grant in California, claiming that the right originated before the grant was made, and had been asserted by open, notorious and adverse occupancy ever since.　The grant had long before been confirmed, and patented by the United States to defendants' predecessors, under the Act of March 3, 1851, c. 41, 9 Stat. 631, which provided for adjudication of private land claims by a commission, with review by the District Court and this Court, and declared that claims not presented to the commission within two years should be deemed abandoned and that patents issued on confirmed claims should be conclusive between the United States and the claimants but should not "affect the interests of third persons." The claim of the Indians was never presented to the commission by them or by the United States on their behalf.　*Held,* on the authority of *Barker* v. *Harvey,* 181 U. S. 481, that the claim of the Indians was abandoned.　*Id.*

288 Fed. 821, affirmed.

APPEAL from a decree of the Circuit Court of Appeals which affirmed a decree of the District Court dismissing a bill to quiet title brought by the United States on behalf of certain Indians.

*Mr. George A. H. Fraser,* Special Assistant to the Attorney General, with whom *Mr. Solicitor General Beck* was on the brief, for the United States.

At the time when California passed under the sovereignty of the United States, the Tejon Indians possessed, under Spanish and Mexican law, an undisputed right and title of possession and use of the land actually occupied by them, being the Indian tract described in the complaint. Recopilacion de las Indias, Bk. 4, Tit. 12, Laws 5, 7, 9, 14, 18; Bk. 6, Tit. 3, Law 9; Hall, Mexican Law, §§ 36, 38, 40, 45, 49, 165; 2 White's New Recopilacion, pp. 50, 52, 242.

All these Spanish laws survived as a portion of the fundamental law of the Mexican Republic. Hall, Mexican Law, §§ 85, 159; Rockwell, Spanish and Mexican Law, pp. 17, 18; *American Ins. Co.* v. *Canter,* 1 Pet. 511; *Mitchel* v. *United States,* 9 Pet. 711; *Chouteau* v. *Molony,* 16 How. 203; *Johnson* v. *McIntosh,* 8 Wheat. 543.

This Indian right was aboriginal, antedated the sovereignty of Spain and Mexico, and was not derived from either, but was recognized and protected by the laws of both. *Holden* v. *Joy,* 17 Wall. 211; *Worcester* v. *Georgia,* 6 Pet. 515.

The Indian title was further acknowledged and fortified in the case at bar, before the transfer of sovereignty, by the special provision for the protection of these Indians, found in the Mexican grant: " They [the grantees] must not interfere with the cultivation and other advantages which the Indians who are found established in said place have always enjoyed." *Chouteau* v. *Molony,* 16 How. 203; *United States* v. *Arredondo,* 6 Pet. 691; *United States* v. *Armijo,* 5 Wall. 444.

By the Treaty of Guadalupe Hidalgo, the United States contracted to preserve and protect all existing rights of property recognized by Mexico, including the foregoing title and right possessed by the Tejon Indians at the date of that treaty. *United States* v. *Auguisola,* 1 Wall. 352; *Knight* v. *United States Land Assn.,* 142 U. S. 161; *United States* v. *Moreno,* 1 Wall. 400; *Beard* v. *Federy,* 3 Wall. 478; *Astiazaran* v. *Santa Rita Mining Co.,* 148 U. S. 80; *Ely's Admr.* v. *United States,* 171 U. S. 220; *Barker* v. *Harvey,* 181 U. S. 481.

This Indian title presented no novelty under American law, because at all times in the history of our jurisprudence the law of the United States was, and still is, practically identical with that of Spain and Mexico in this regard, namely, that Indians have an original right and title of occupancy, possession and use prior to the right or title of Spain, Mexico or the United States, which can be extinguished only by the sovereign, and which, until so extinguished, is as sacred as the sovereign title or the fee title.

The Indian title is both legal and equitable in its nature and has been variously likened to an easement, life estate, trust or use with which the fee is charged. *Johnson* v. *McIntosh,* 8 Wheat. 543; *Marsh* v. *Brooks,* 8 How. 223; *United States* v. *Cook,* 19 Wall. 591; *Buttz* v. *Northern Pacific R. R.,* 119 U. S. 55; *Kennedy* v. *Becker,* 241 U. S. 556.

Further, when the fee passes from the Government into private hands under a general conveyance, it is, for the time being, only a naked fee. The private grantee has the title, but the Indians have the beneficial use until the sovereign, which alone has the power to interfere, extinguishes such use. *Seymour* v. *Freer,* 8 Wall. 202; *Jones* v. *Byrne,* 149 Fed. 457; *Corbin* v. *Holmes,* 154 Fed. 593.

The Indian title is not extinguished by an unconditional grant in fee by the sovereign. *United States* v.

*Arredondo,* 6 Pet. 691; *Johnson* v. *McIntosh,* 8 Wheat. 543; *United States* v. *Fernandez,* 10 Pet. 303; *Buttz* v. *Northern Pacific R. R.,* 119 U. S. 55.

The Indian title is extinguished only by words or acts distinctly indicating such purpose, of which there have been none in this case on the part of Mexico or the United States; and in the history of the United States, has been abrogated always under some terms of compensation to the Indians. There has been no compensation here.

The Act of March 3, 1851, 9 Stat. 631, not only does not require tribal Indians to appear before the Commission created by that act, there to assert their right to occupancy under penalty of losing it by nonappearance, but distinctly shows a contrary intent. The affirmative action it requires is not by the Indians but by the Commission, which is instructed to investigate that right or title and given power to report thereon but not to adjudicate.

The Act of 1851 contemplated primarily nothing more than the separation of the lands which were owned by individuals from the public domain. *United States* v. *Morillo,* 1 Wall. 706; *United States* v. *Fossat,* 20 How. 413; *Meader* v. *Norton,* 11 Wall. 442; *Thompson* v. *Los Angeles Farming Co.,* 180 U. S. 72; *Botiller* v. *Dominguez,* 130 U. S. 238.

The act did not intend to require tribal Indians to present their occupancy title to the Commission under penalty of its extinguishment.

This Court has specifically held it improper for the holders of titles subordinate to the fee to present their claims to the Commission. *United States* v. *Fossat,* 20 How. 413; *Townsend* v. *Greeley,* 5 Wall. 326.

In view of the ignorant, dependent and helpless state of the Indians and the assumption of the Government toward them of the high obligation of guardian to ward, statutes and treaties are invariably construed liberally in their favor. *Marks* v. *United States,* 161 U. S. 297.

General acts of Congress do not apply to them at all unless so worded as clearly to manifest an intention to include them. *Elk* v. *Wilkins,* 112 U. S. 94; *Leavenworth, etc. R. R. Co.* v. *United States,* 92 U. S. 733; *United States* v. *Nice,* 241 U. S. 591.

Their rights were within the ample guaranty given by the United States in the Treaty of 1848.

Appellees' theory is that by the Act of 1851 the Government under form of law in effect falsified its pledge by making the preservation of the Indian title conditional upon wild savages, or at best semi-civilized children, becoming aware of the proceedings of Congress; and thereupon within a limited time convening from distances of hundreds of miles, through wild and unsettled country, extensively occupied by suspicious or warring tribes, at San Francisco, and there appearing unaided before a white man's court, and making formal proof in a foreign language according to a prescribed procedure. This is, indeed, " to keep the word of promise to the ear and break it to the hope." It makes Congress cloak the purposeful confiscation of a title it had undertaken to preserve by means of a dishonorable subterfuge.

Statutes must not be so construed as to accuse the United States of bad faith. *Leavenworth, etc. R. R. Co.* v. *United States,* 92 U. S. 733; *United States* v. *Kirby,* 7 Wall. 482.

Throughout American history the Indian title has never been abrogated inferentially or without compensation.

The presumption is against a departure from a long-established and uniform course of policy. *Morton* v. *Nebraska,* 21 Wall. 660; *United States* v. *Munday,* 222 U. S. 175.

Contemporaneous legislation, both of the United States and the State of California, and subsequent legislation of the United States, support our construction of the Act of 1851 and show that both Nation and State regarded the

Indian possession as an admitted right which not only was not to be inferentially extinguished, but was to be affirmatively protected.

*Barker* v. *Harvey,* 181 U. S. 481, is distinguishable in fact and in law.  (1) It was officially determined by the Mexican authorities that the Indians there involved had voluntarily abandoned their occupancy before Mexico granted the land; (2) as a natural result the grant which the Commission confirmed contained no recognition of Indian possession, or protective provision in their favor; (3) the Indian claim was presented as though founded on a protective clause in an earlier grant, which grant, however, the Commission had rejected (probably because unconfirmed by the Departmental Assembly,) and its true basis, viz: the tribal possessory title, was apparently not emphasized; (4) the Indian title was presented as permanent·in the sense that no one, not even the United States, could extinguish it.  Cf. *Minnesota* v. *Hitchcock,* 185 U. S. 373.

What, then, is the effect of the legal discussion forming the first half of the opinion?  One of two things is true: (1) That discussion was perhaps invited by erroneous contentions that the protective clause in the first grant founded or created a title, and that that title was fixed and permanent beyond the power of the Government to cancel it.  If so, the remarks have no bearing whatever on the case at bar.  (2) In so far as the general possessory title was under consideration, the discussion was " unnecessary to the decision and in that sense extrajudicial," *Hans* v. *Louisiana,* 134 U. S. 1, because that title had been extinguished by the sole fact of voluntary abandonment.

Now, however, the United States comes with a set of facts vitally different and for the first time requiring a decision. on the points of law academically discussed in the earlier case.  Under such circumstances this Court has repeatedly announced that the extrajudicial discussion

is not controlling. *Carroll* v. *Carroll's Lessee,* 16 How. 275; *Pollock* v. *Farmers' Loan & Trust Co.,* 157 U. S. 429; *Brooks* v. *Marbury,* 11 Wheat. 78; *Hans* v. *Louisiana,* 134 U. S. 1; *McCormick Co.* v. *Aultman,* 169 U. S. 606; *United States* v. *Wong Kim Ark,* 169 U. S. 649; *Downes* v. *Bidwell,* 182 U. S. 244; *Harriman* v. *Northern Securities Co.,* 197 U. S. 244; *Joplin Co.* v. *United States,* 236 U. S. 531; *Union Tank Line Co.* v. *Wright,* 249 U. S. 275.

There are two statements of law in the *Barker Case* which are hard to discuss, because it is impossible to be certain whether, as we believe, they apply only to the peculiar sort of title there apparently claimed, or whether, as appellants contend, they announce a general rule applicable even to an Indian tribal title, such as is presented here, protected but not created by a Mexican grant.

One is that "public domain" is the same as "public lands;" that lands encumbered with the Indian easement or use cannot be treated or considered as "public lands" in the ordinary sense; and that, therefore, when § 13 of the Act of 1851 made lands to which claims had not been presented part of the public domain, it intended to extinguish the Indian title wherever unpresented.

While these expressions are sometimes loosely used as equivalent, it is perfectly obvious that they are not in fact synonymous. A national park, or a forest reserve, or an Indian reservation is certainly part of the public domain, and as certainly not a part of the "public lands of the United States" in the sense of lands subject to sale or disposal under general laws. What is really meant by "public domain" is seen in *Missionary Society* v. *Dalles,* 107 U. S. 336. See *Buttz* v. *Northern Pacific R. R.,* 119 U. S. 55; *St. Paul, etc. Ry. Co.* v. *Phelps,* 137 U. S. 528.

But the same result would be reached even if Congress had said "public lands of the United States," since land may be and often has been treated as public land of

the United States, although admittedly subject to the Indian title of occupancy and possession. *Kindred* v. *Union Pacific R. R. Co.*, 225 U. S. 582. Lands subject to the ordinary Indian title, here claimed, have over and over again been treated as public lands both of Mexico and the United States and have been granted subject to that title.

Section 15 of the Act of 1851 reading: " That the final decrees . . . or any patent to be issued under this act shall be conclusive between the United States and the said claimants only, and shall not affect the interests of third persons," in plain and simple language preserves the Indian title under decree and patent alike until the Government itself affirmatively acts to extinguish it. The Commission itself so held in this very case.

And if this decree, thus affirmed, expressly states that it does not affect Indian rights, how can the patent which followed it, and which the act puts on the same footing as the decree, affect them?

We confidently submit that *Barker* v. *Harvey*, 181 U. S. 481, is demonstrably wrong if it means that the Indians here concerned are not protected by the provision that decrees and patents shall not affect third persons.

The term " third persons " necessarily has a general signification outside of the restricted application required by the narrow and unusual facts of *Beard* v. *Federy*. It necessarily includes exactly the sort of persons of whom the tribal Indians are examples. This view is confirmed by repeated decisions of this Court. *Townsend* v. *Greeley*, 5 Wall. 326; *Meader* v. *Norton*, 11 Wall. 442; *Carpentier* v. *Montgomery*, 13 Wall. 480; *Adam* v. *Norris*, 103 U. S. 591; *Boquillas Co.* v. *Curtis*, 213 U. S. 339; *Los Angeles Milling Co.* v. *Los Angeles*, 217 U. S. 217; *Wilson Cypress Co.* v. *Del Pozo*, 236 U. S. 635.

A rule of property can be no wider than the facts ruled on. The only rule founded on the essential facts of the

*Barker Case* is that Indians who voluntarily abandon their possession lose their possessory title.

A rule of property is not established by a single decision. *Bucher* v. *Cheshire R. R. Co.,* 125 U. S. 555; *Chicago* v. *Robbins,* 2 Black, 418; *Yates* v. *Milwaukee,* 10 Wall. 497; *Kuhn* v. *Fairmont Coal Co.,* 215 U. S. 349.

The passages in the *Barker Case* construed by appellees as favorable to them are contradicted in *Minnesota* v. *Hitchcock,* 185 U. S. 373, and very recently in *Cramer* v. *United States,* 261 U. S. 219.

The doctrine of *stare decisis* is not inflexible. *Hertz* v. *Woodman,* 218 U. S. 205; *Pollock* v. *Farmers' Loan & Trust Co.,* 157 U. S. 429.

The disastrous effect on titles anticipated as the result of a reversal is imaginary.

*Mr. Walter K. Tuller,* with whom *Mr. Henry W. O'Melveny, Mr. E. E. Millikin* and *Mr. Sayre Macneil* were on the brief, for appellees.

The law governing this case is settled by numerous decisions of this Court and has become a rule of property. *Barker* v. *Harvey,* 181 U. S. 481; *Minnesota Co.* v. *National Co.,* 3 Wall. 332; *United States* v. *Heirs of Waterman,* 14 Pet. 478; *McDougal* v. *McKay,* 237 U. S. 372; *Beard* v. *Federy,* 3 Wall. 478; *Botiller* v. *Dominguez,* 130 U. S. 238; *Knight* v. *United States Land Assn.,* 142 U. S. 161; *Thompson* v. *Los Angeles Farming Co.,* 180 U. S. 72.

The claim of appellant that the rights of the Indians, whatever they may have been, during the time Spain or Mexico held sovereignty of California, were not derived from the Spanish or Mexican law, is unsound. Title to or rights in or over real property exist only by virtue of law, and that law is the law of the country which is sovereign over the territory. *Johnson* v. *McIntosh,* 8 Wheat. 543.

The most that can possibly be claimed is that the Indians had a temporary right of occupancy revocable at the will of the sovereign; in other words, a mere license revocable at the pleasure of the Government. This is the most even under the laws of Spain. If anything, the Indians had even less rights under the laws of Mexico. *Hayt* v. *United States,* 38 Ct. Clms. 455, 461–462.

MR. JUSTICE VAN DEVANTER delivered the opinion of the Court.

This is a suit by the United States as guardian of certain Mission Indians to quiet in them a " perpetual right " to occupy, use, and enjoy a part of a confirmed Mexican land grant in southern California, for which the defendants hold a patent from the United States. The District Court dismissed the bill as not showing a cause of action, and its decree was affirmed by the Circuit Court of Appeals. 288 Fed. 821.

The grant was made by Mexico in 1843. After California was ceded to the United States, Congress, in 1851, passed an act providing for the ascertainment and adjudication of private land claims in the ceded territory, c. 41, 9 Stat. 631. The act created a commission to consider and pass on such claims, provided for a review in the District Court of that district, and for a further review in this Court; required that the claims be presented to the commission within two years, in default of which they were to be regarded as abandoned; provided for the issue of patents on such as were confirmed, and declared the patents should be " conclusive between the United States and the said claimants," but should not " affect the interests of third persons." This grant was presented to the commission, and, after a hearing in which the United States participated, was confirmed. On an appeal by the United States the District Court affirmed that decision, and a further appeal to this Court was aban-

doned and dismissed. Thereafter, in 1863, the patent under which the defendants claim was issued.

The bill alleges that under the laws of Mexico the Indians in whose behalf the bill is brought became entitled to the " continuous and undisturbed" occupancy and use of a part of the lands in the grant before it was made; that the Indians were in open, notorious, and adverse occupancy of such lands at the date of the grant, and that they ever since have remained in such occupancy, save as they have been more or less disturbed by the defendants and their predecessors at different times since the patent issued. The bill was brought in 1920. It does not question the validity of the grant or of the patent, but proceeds on the theory that the grant was made, and the title under the patent is held, subject to a " perpetual right" in the Indians and their descendants to occupy and use the lands in question. The Indians never presented their claim to the commission, nor did the United States do so for them.

The courts below held that the claim of the Indians, if they had any, was abandoned and lost by the failure to present it to the commission, and that the patent issued on the confirmation of the grant passed the full title, unencumbered by any right in the Indians. In so holding, those courts gave effect to what they understood to be the decision of this Court in *Barker* v. *Harvey*, 181 U. S. 481.

The questions to be considered here are whether the decision in that case covers this case, and, if it does, whether it should be followed or overruled. That was a suit by the owner of a Mexican grant in southern California against Mission Indians to quiet his title under a confirmation and patent against their claim to a permanent right to occupy and use a part of the lands. In the state court where the suit was brought, the plaintiff had a decree, which the Supreme Court of the State affirmed.

In the right of the Indians the United States then brought the case here and took charge of and presented it for them. This Court sustained the decision of the state courts.

In the trial court the Indians had produced evidence tending to show that they and their ancestors had been occupying and using the lands openly and continuously from a time anterior to the Mexican grant, and that while they remained under the dominion of Mexico that government protected them in their right and recognized its permanency. But at the conclusion of the trial that evidence had been stricken out over their objection, because it appeared that their claim had not been presented to the commission under the Act of 1851. On the evidence remaining the decree necessarily had been against them. Thus the question presented was whether there was error in striking out the evidence of their prior occupancy and use and of the permanency of their right as recognized by Mexico.

This Court, after observing that under the treaty with Mexico and the rules of international law the United States was bound to respect the rights of private property in the ceded territory, said there could be no doubt of the power of the United States, consistently with such obligation, to provide reasonable means for determining the validity of all titles within the ceded territory, to require all claims to lands therein to be presented for examination, and to declare that all not presented should be regarded as abandoned. The Court further said the purpose of the Act of 1851 was to give repose to titles as well as to fulfill treaty obligations, and that it not only permitted but required all claims to be presented to the commission, and barred all from future assertion which were not presented within the two years. Earlier decisions showing the effect theretofore given to patents issued under the act were cited and approved; and, com-

ing to the provision that the patent shall not "affect the interests of third persons," the Court held, as it had done in a prior case: "The term 'third persons', as there used, does not embrace all persons other than the United States and the claimants, but only those who hold superior titles, such as will enable them to resist successfully any action of the government in disposing of the property." The Court then proceeded:

"If these Indians had any claims founded on the action of the Mexican government they abandoned them by not presenting them to the commission for consideration, and they could not, therefore, in the language just quoted, 'resist successfully any action of the government in disposing of the property'. If it be said that the Indians do not claim the fee, but only the right of occupation, and, therefore, they do not come within the provision of section 8 as persons 'claiming lands in California by virtue of any right or title derived from the Spanish or Mexican government,' it may be replied that a claim of a right to permanent occupancy of land is one of far-reaching effect, and it could not well be said that lands which were burdened with a right of permanent occupancy were a part of the public domain and subject to the full disposal of the United States. There is an essential difference between the power of the United States over lands to which it has had full title, and of which it has given to an Indian tribe a temporary occupancy, and that over lands which were subjected by the action of some prior government to a right of permanent occupancy, for in the latter case the right, which is one of private property, antecedes and is superior to the title of this government, and limits necessarily its powers of disposal. Surely a claimant would have little reason for presenting to the land commission his claim to land, and securing a confirmation of that claim, if the only result was to transfer the naked fee to him, burdened by an Indian right of permanent occupancy.

"Again, it is said that the Indians were, prior to the cession, the wards of the Mexican government, and by the cession became the wards of this government; that, therefore, the United States are bound to protect their interests, and that all administration, if not all legislation, must be held to be interpreted by, if not subordinate to, this duty of protecting the interests of the wards. It is undoubtedly true that this government has always recognized the fact that the Indians were its wards, and entitled to be protected as such, and this court has uniformly construed all legislation in the light of this recognized obligation. But the obligation is one which rests upon the political department of the government, and this court has never assumed, in the absence of Congressional action, to determine what would have been appropriate legislation, or to decide the claims of the Indians as though such legislation had been had. Our attention has been called to no legislation by Congress having special reference to these particular Indians. By the Act creating the land commission the commissioners were required (sec. 16) 'to ascertain and report to the Secretary of the Interior the tenure by which the mission lands are held, and those held by civilized Indians, and those who are engaged in agriculture or labor of any kind, and also those which are occupied and cultivated by Pueblos or Rancheros Indians.' It is to be assumed that the commissioners performed that duty, and that Congress, in the discharge of its obligation to the Indians, did all that it deemed necessary, and as no action has been shown in reference to these particular Indians, or their claims to these lands, it is fairly to be deduced that Congress considered that they had no claims which called for special action."

Enough has been said to make it apparent that that case and this are so much alike that what was said and

ruled in that should be equally applicable in this.   But it is urged that what we have described as ruled there was *obiter dictum* and should be disregarded, because the Court there gave a second ground for its decision which was broad enough to sustain it independently of the first ground.   The premise of the contention is right but the conclusion is wrong; for where there are two grounds, upon either of which an appellate court may rest its decision, and it adopts both, "the ruling on neither is *obiter*, but each is the judgment of the court and of equal validity with the other."   *Union Pacific R. R. Co.* v. *Mason City & Fort Dodge R. R. Co.,* 199 U. S. 160, 166; *Railroad Companies* v. *Schutte,* 103 U. S. 118, 143.

The question whether that decision shall be followed here or overruled admits of but one answer.   The decision was given twenty-three years ago and affected many tracts of land in California, particularly in the southern part of the State.   In the meantime there has been a continuous growth and development in that section, land values have enhanced, and there have been many transfers.   Naturally there has been reliance on the decision. The defendants in this case purchased fifteen years after it was made.   It has become a rule of property, and to disturb it now would be fraught with many injurious results.   Besides, the government and the scattered Mission Indians have adjusted their situation to it in several instances.   As long ago as *Minnesota Co.* v. *National Co.,* 3 Wall. 332, this Court said, p. 334: "Where questions arise which affect titles to land it is of great importance to the public that when they are once decided they should no longer be considered open.   Such decisions become rules of property, and many titles may be injuriously affected by their change.   Legislatures may alter or change their laws, without injury, as they affect the future only; but where courts vacillate and overrule their own decisions on the construction of statutes affecting

the title to real property, their decisions are retrospective and may affect titles purchased on the faith of their stability. Doubtful questions on subjects of this nature, when once decided, should be considered no longer doubtful or subject to change."

That rule often has been applied in this and other courts and we think effect should be given to it in the present case.

*Decree affirmed.*