**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| DAVID LAUGHING HORSE ROBINSON, an individual and Chairman, Kawaiisu Tribe of Tejon; KAWAIISU TRIBE OF TEJON, *Plaintiffs-Appellants*, <br><br> v. <br><br> SALLY JEWELL, Secretary, U.S. Department of the Interior; TEJON MOUNTAIN VILLAGE, LLC; COUNTY OF KERN; TEJON RANCH CORPORATION; TEJON RANCHCORP, *Defendants-Appellees*. | No. 12-17151 <br><br> D.C. No. 1:09-cv-01977-BAM <br><br><br> OPINION |

Appeal from the United States District Court
for the Eastern District of California
Barbara McAuliffe, Magistrate Judge, Presiding

Argued and Submitted
November 20, 2014—San Francisco, California

Filed June 22, 2015

Before: Sidney R. Thomas, Chief Judge, and Stephen
Reinhardt and Morgan Christen, Circuit Judges.

Opinion by Chief Judge Thomas

## SUMMARY[*]

### Tribal Land Rights

The panel affirmed the district court's dismissal of the claims of the Kawaiisu, a non-federally recognized Native American group, and its elected chairperson, David Laughing Horse Robinson, asserting title to the Tejon Ranch, one of the largest continuous expanses of private land in California.

The panel held that the district court properly determined that the Tribe had no ownership interest in the Tejon Ranch and that no reservation was established. Specifically, the panel held that the district court correctly concluded that the Tribe's failure to present a claim to the Board of Commissioners created by the California Land Claims Act of 1851 extinguished its title; that the Treaty with the Utah did not convey land rights to the signatory tribes or recognize aboriginal title; and that Treaty D was never ratified and conveyed no rights. The panel rejected the Tribe's complaints of alleged forgery and deception in obtaining patents for the four Mexican land grants comprising Tejon Ranch because all of the alleged acts occurred prior to the submission of the claims to the Board of Commissioners, and the Tribe could not challenge the validity of land patents after more than a century of time had passed.

The panel held that the claims against Kern County were subsumed into the Tejon Ranch ownership determination. The panel further held that the Tribe's claims originally

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

asserted against the Secretary of the United States Department of the Interior, and Robinson's individual claims, were waived for failure to assert them on appeal. The panel declined to consider the Tribe's new arguments on appeal.

## COUNSEL

Jeffrey M. Schwartz (argued), Schwartz Law, P.C., San Clemente, California, for Plaintiffs-Appellants.

Tamara N. Rountree (argued), Barbara M. R. Marvin, and William Lazarus, Attorneys, United States Department of Justice, Environment & Natural Resources Division, Appellate Section, Washington, D. C., Defendant-Appellee Secretary of Interior.

Eric D. Miller (argued), Perkins Coie LLP, Seattle, Washington; Jennifer A. MacLean, Benjamin S. Sharp, and Elisabeth C. Frost, Perkins Coie LLP, Washington D.C., for Defendants-Appellees Tejon Mountain Village, LLC, Tejon Ranch Corporation, and Tejon Ranchcorp.

Charles F. Collins (argued) and Theresa A. Goldner, Kern County Administrative Center, Bakersfield, California, for Defendant-Appellee Kern County.

## OPINION

THOMAS, Chief Judge:

In this appeal, the Kawaiisu, a non-federally recognized Native American group indigenous to the Tehachapi Mountains and the Southern Sierra Nevada ("the Tribe" or "the Kawaiisu"), and its elected chairperson, David Laughing Horse Robinson, appeal the dismissal of their claims asserting title to the Tejon Ranch, one of the largest continuous expanses of private land in California. We review *de novo* a district court's order granting a motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6), *Manzarek v. St. Paul Fire & Marine Ins., Co.*, 519 F.3d 1025, 1030 (9th Cir. 2008), and we affirm the judgment of the district court.

I

As with most land disputes of this type, historical perspective is important in resolving the claims. During first the Spanish and then the Mexican occupations of what is now California, those governments encouraged settlement by issuing large land grants in the territory. At the conclusion of the Mexican-American War in 1848, the United States acquired California from Mexico through the Treaty of Guadalupe Hidalgo. The treaty promised to honor Spanish and Mexican land grants. Treaty of Peace, Friendship, Limits, and Settlement between the United States of America and the Mexican Republic art. VIII–IX, Feb. 2, 1848, 9 Stat. 922 ("Treaty of Guadalupe Hidalgo").

The discovery of gold in California just eight days prior to the signing of the treaty, and the subsequent, unprecedented influx of settlers to the territory, placed a great deal of pressure on land claims. To resolve disputes over the validity of private title to land, Congress passed the Act of March 3, 1851, ch. 41, 9 Stat. 631 ("Act of 1851"), commonly known as the California Land Claims Act of 1851. The Act created a Board of Commissioners ("Commission") to evaluate claims and required that anyone claiming title derived from a Mexican or Spanish grant present a claim to the Commission within two years. *Id.* § 8. Any land not claimed within that period, or for which a claim was rejected, would be returned to "the public domain of the United States." *Id.* § 13.

No Indian groups, including the predecessors to the Kawaiisu, registered claims with the Commission during the two-year period. In addition, the United States Senate refused to ratify any of the eighteen treaties negotiated with California tribes between 1851 and 1852, a decision that was sealed until 1905. William C. Sturtevant, HANDBOOK OF NORTH AMERICAN INDIANS: CALIFORNIA 702–03 (1978).

Following the cessation of hostilities with Mexico and the signing of the Treaty of Guadalupe Hidalgo, the United States entered into and ratified a treaty with an array of western Native American leaders collectively referred to as "the Utah." The Treaty with the Utah, signed in 1849 in Santa Fe, New Mexico, provided for an end to hostilities between the Utah tribes and the United States and stipulated that the Utahs accept and submit to the jurisdiction of the United States. Further, it stated:

> [The United States] shall, at its earliest
> convenience, designate, settle, and adjust their
> territorial boundaries . . . . [a]nd the said
> Utahs, further, bind themselves not to depart
> from their accustomed homes or localities
> unless specially permitted . . . and so soon as
> their boundaries are distinctly defined, the
> said Utahs are further bound to confine
> themselves to said limits, under pueblos, or to
> settle in such other manner as will enable
> them most successfully to cultivate the soil,
> and pursue such other industrial pursuits as
> will best promote their happiness and
> prosperity: and they now deliberately and
> considerately, pledge their existence as a
> distinct tribe, to abstain, for all time to come,
> from all depredations; to cease the roving and
> rambling habits which have hitherto marked
> them as a people; to confine themselves
> strictly to the limits which may be assigned
> them; and to support themselves by their own
> industry, aided and directed as it may be by
> the wisdom, justice, and humanity of the
> American people.

Treaty with the Utah, Dec. 30, 1849, art. VII, 9 Stat. 984.
The Kawaiisu allege that several of its leaders, including its
head chief at the time, Acaguate Nochi, were among the
signatories to the treaty.

The Kawaiisu identify themselves as "an Indian Tribe that
has resided in and around Kern County, California since time
immemorial." Plaintiff Robinson traces his lineage through
multiple previous head chiefs of the Kawaiisu back to

Acaguate Nochi. The Kawaiisu are not currently, and have never been, included on the official list of federally recognized tribes maintained by the Bureau of Indian Affairs at the Department of the Interior.

According to the Tribe's complaint, the Kawaiisu first appeared in the historical record in the 1776 diary of Father Francisco Garces. Father Garces' map of the following year notes the Tribe's presence according to a number of its historic names. While the name Kawaiisu derives linguistically from a tribe to the north in San Joaquin Valley, the Tribe identifies as "one of the ancient Great Basin Shoshone Paiute Tribes whose pre-European territory extended from Utah to the Pacific Ocean." The Kawaiisu's complaint lists an array of ethnographic accounts documenting its unique tribal identity, including the Bureau of American Ethnology's 1907 Handbook of American Indians North of Mexico.

In 1851—two years after the signing of the Treaty with the Utah and just a few months after the California Land Claims Act of 1851 went into effect—the United States executed a treaty with "various tribes of Indians in the State of California" in which the tribes agreed to cede large portions of land and the federal government promised to set aside reservations "for the sole use and occupancy" of the tribes and supply the Indians with goods and services, including schools. This treaty, known as "Treaty D," was submitted to Congress but never ratified by the Senate.[1]

---

[1] In 1927, the California legislature passed a statute authorizing the California Attorney General to bring suit on behalf of the tribes who were party to Treaty D and seventeen other unratified treaties. On May 18, 1928, Congress passed The Indians of California Act, 25 U.S.C. § 651,

In the absence of any ratified treaties with the Indians of California, the establishment of reservations in the state could only result from an act of Congress or from the President acting under delegation from Congress. Three acts of Congress—taking place in 1853, 1855, and 1864—are relevant here. The Act of 1853 authorized the President to create five "military reservations" no more than 25,000 acres in size in the state of California or the territories of Utah and New Mexico. Act of March 3, 1853, ch. 104, 10 Stat. 226, 238. In 1855, Congress amended the Act of 1853 to provide funding and authorization for two additional reservations. Act of March 3, 1855, 10 Stat. 699.

During the period prior to 1864, the President appears to have only officially created three reservations in California. *Mattz v. Arnett*, 412 U.S. 481, 489 (1973) ("At the time of the passage of the 1864 Act there were, apparently, three reservations in California: the Klamath River, the Mendocino, and the Smith River."). The Tribe alleges that the Tejon/Sebastian Reservation was created pursuant to the Act of 1853, pointing to a letter from President Franklin Pierce to the Secretary of the Interior, Robert McClelland, and a subsequent letter from the Secretary to the Superintendent of Indian Affairs for California, Edward F. Beale, from that same year.

which granted jurisdiction to the Court of Claims to hear these cases. Earl Warren, representing "all those Indians of the various tribes, bands and rancherias who were living in the State of California on June 1, 1852, and their descendants living in the State," *Indians of California by Webb v. United States*, 98 Ct. Cl. 583, 585 (Ct. Cl. 1942), negotiated a $5,024,842.34 judgment in favor of the Indians. *See Round Valley Indian Tribes v. United States*, 97 Fed. Cl. 500, 504 (Fed. Cl. 2011).

After quoting the paragraph of the 1853 Act authorizing creation of five reservations, President Pierce's letter states, "In the exercise of discretion vested in me by said act of Congress, I have examined and hereby approve the plan therein proposed for the protection of the Indians in California, and request that you will take the necessary steps for carrying the same into effect." Secretary McClelland's letter to Superintendent Beale repeats the language from the Act of 1853 and then states that:

> The President of the United States has examined and approved the plan provided for in said act, and directs that you be charged with the duty of carrying it into effect. For this purpose you will repair to California without delay, and by the most expeditious route. The selections of the military reservations are to be made by you in conjunction with the military commandant in California, or such officer as may be detailed for that purpose, in which case they must be sanctioned by the commandant. It is likewise the President's desire that, in all other matters connected with the execution of this "plan," you will, as far as may be practicable, act in concert with the commanding officer of that military department.

However, no Presidential proclamation or executive order was ever issued regarding the Tejon or Sebastian Reservation.

In 1864, Congress significantly reorganized management of reservations in California. The Act of 1864 consolidated California as one Indian superintendency, empowered the

President to create no more than four reservations, and required that lands not retained as reservations under the Act be offered for public sale. Act of Apr. 8, 1864, ch. 40, 48, 13 Stat. 39. The President eventually established four reservations by executive order. The Tejon/Sebastian Reservation was not among them.

The land at issue in the case—the 270,000 acres comprising Tejon Ranch and the 49,000 of those acres referred to as the Tejon or Sebastian Reservation—is made up of portions of four different Mexican land grants: Rancho El Tejon, Rancho los Alamos y Agua Caliente, Rancho Castac, and Rancho La Liebre. The various holders of those four grants submitted claims pursuant to the Act of 1851, all of which were confirmed by the Commission, which issued patents for the claims between 1863 and 1875. The rights to all four of these grants were acquired by Edward F. Beale between 1855 and 1866. Defendants Tejon Mountain Village, LLC, Tejon Ranch Corporation, and Tejon Ranchcorp (collectively, "Tejon Ranch Defendants") ultimately acquired title through transactions traceable to the patents. The Tejon Ranch Defendants propose a 3,450-home development named Tejon Mountain Village on the Tejon Ranch.

The Tribe filed this action asserting title under a variety of theories ultimately asserting four claims against the

Secretary of Interior,[2] two against the Tejon Ranch Defendants,[3] and one against Kern County, California.[4]

After dismissing two complaints with leave to amend, the district court dismissed the complaint with prejudice.

II

The Tribe has waived appeal of its claims against the Secretary by failing to "present a specific, cogent argument for our consideration." *Greenwood v. FAA*, 28 F.3d 971, 977 (9th Cir. 1994); *see also* Fed. R. App. P. 28(a)(8)(A) (requiring that an appellant's brief must contain an argument section which includes their "contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies").

---

[2] The Tribe's claims against the Secretary are (1) deprivation of property without due process in violation of the Fifth Amendment by wrongfully omitting the Tribe from the list of federally recognized tribes and failing to correct that omission; (2) breach of fiduciary duty by not intervening on the Tribe's behalf to stop the proposed development of Tejon Mountain Village; (3) denial of equal protection in violation of the Fifth Amendment by extending benefits to other tribal groups while failing to recognize the Tribe; and (4) non-statutory review of the Secretary's failure to recognize the Tribe, based on federal recognition by virtue of the Act of Congress ratifying the 1849 Treaty with the Utah.

[3] The Tribe's claims against the Tejon parties include unlawful possession of Tejon Ranch, trespass, violation of NAGPRA, and violation of the Non-Intercourse Act.

[4] The Tribe's sole claim against Kern County is for equitable enforcement of treaty—essentially forcing the County to revoke its approval of permits for the development of Tejon Mountain Village.

On appeal, the Tribe asserts a new theory of estoppel against the Secretary and suggests that the United States violated its trust responsibility by failing to present or preserve the Tribe's claims before the Commission. Neither theory was presented to the district court. We decline to consider arguments raised for the first time on appeal. *Raich v. Gonzales*, 500 F.3d 850, 868 (9th Cir. 2007).

III

A

The Tribe claims ownership to the Tejon Ranch as against the Tejon Ranch Defendants on its alleged receipt of a Spanish land grant, its rights under the 1849 Treaty with the Utah, and its negotiation of Treaty D with the federal government. However, the district court correctly concluded that the Tribe's failure to present a claim to the Commission pursuant to the California Land Claims Act of 1851 extinguished its title, that the Treaty with the Utah did not convey land rights to the signatory tribes or recognize aboriginal title, and that Treaty D was never ratified and conveyed no rights.

The Tribe asserts that "[i]n 1777, the Spanish government granted the Kawaiisu land in what would become the State of California." The only support for this assertion is its alleged presence on Diseno Maps from that year created by Father Francisco Garces.[5]    Even assuming that the Kawaiisu

---

[5] We note, however, that in its Second Amended Complaint, and in the Tribe's opposition to the Tejon Ranch Defendants' motion to dismiss the Third Amended Complaint, the Tribe argued that its land rights explicitly do *not* derive from any Spanish or Mexican grant.

possessed such a grant, the terms of the Treaty of Guadalupe Hidalgo alone were insufficient to preserve it. The Land Claims Act of 1851 required that "each and every person claiming lands in California by virtue of any right or title derived from the Spanish or Mexican government, shall present the same to the said commissioners . . . ." 9 Stat. 631, § 8. Presentation to the Commission was the only avenue allowed by the Act for preservation of claims and the issuance of a patent. Section 13 of the Act provides that "all lands the claims to which shall not have been presented to the said commissioners within two years after the date of this act, shall be deemed, held and considered as part of the public domain of the United States." *Id.* § 13. The Tribe concedes that it did not present any claims to the Commission within the statutory time frame.

The Tribe claims land rights were bestowed by the subsequent Treaty with the Utah, or, alternatively, argues that its participation in Treaty D constituted substantial compliance with the Act of 1851. Neither argument is persuasive.

The Treaty with the Utah did not grant the Tribe title to Tejon Ranch, nor did it recognize aboriginal title of any of the signatory tribes, including the Kawaiisu. Aboriginal title "means mere possession not specifically recognized as ownership by Congress." *Tee-Hit-Ton Indians v. United States*, 348 U.S. 272, 279 (1955). Absent such recognition by Congress, aboriginal right of occupancy can be terminated by the sovereign at any time "without any legally enforceable obligation to compensate the Indians." *Id.* Recognition of aboriginal title requires a clear statement from Congress unequivocally granting legal rights. *See Uintah Ute Indians of Utah v. United States*, 28 Fed. Cl. 768, 786 (Fed. Cl. 1993)

("Recognition of Indian title may take various forms, but such recognition must manifest a definite intention to accord legal rights."). "The Congress must affirmatively intend to grant the right to occupy and use the land permanently. By 'recognition,' the courts have meant that Congress intended to acknowledge . . . to Indian tribes rights in land which were in addition to the Indians' traditional use and occupancy rights exercised only with the permission of the sovereign." *Sac & Fox Tribe v. United States*, 315 F.2d 896, 900 (Ct. Cl. 1963) (internal quotation marks and citation omitted).

The question of whether the Treaty with the Utah created any enforceable property rights has been addressed by the Court of Federal Claims, which determined in 1993 that the 1849 treaty did not recognize Indian title. *Uintah Ute Indians*, 28 Fed. Cl. at 786. As that court observed, "Article VII of the 1849 treaty does not recognize title because the boundaries of aboriginal lands were to be settled in the future. By its terms the treaty does not designate, settle, adjust, define, or assign limits or boundaries to plaintiff; it leaves such matters to the future. Consequently, the treaty cannot be said to recognize Indian title."

The district court correctly adopted the reasoning of *Uintah Ute Indians*. By referring to "limits which may be assigned [the Utahs]" that they would be "bound to confine themself to," the Treaty's language indicates that any rights to the land the Indians occupied at the time of its execution were not recognized by the United States government. Treaty with the Utah, art. VII. We cannot assume that Congress would have intended through its ratification of the Treaty with the Utah to grant title to the vast, then-indeterminate expanses of land occupied by the various signatory tribes. The Treaty's language points to its aims of promoting

peaceful relations and encouraging the Indians to adopt a more geographically constrained agrarian mode of living. *Id.*[6]

Treaty D, executed in 1851 by the Kawaiisu and the United States, was never ratified by the Senate and thus carries no legal effect. *See* U.S. Const. Art. II, § 2, cl. 2. The treaty itself contained language to that effect, stating that it would "be binding on the contracting parties when ratified and confirmed by the President and Senate of the United States of America." The Kawaiisu argue that through its participation in Treaty D, the Tribe "substantially complied" with the Act of 1851 and thus perfected title tracing to its alleged Spanish land grant or the Treaty with the Utah. This argument also fails. The Act of 1851 provides for no alternative to presenting one's claims to the Commission.

Treaty D granted no land rights, nor did it create any other enforceable rights, as it was never ratified and is thus a legal nullity.[7] It was also insufficient for the purposes of the Act of

---

[6] The Tribe also contends that "the district court's interpretation of the Treaty with the Utahs was fatally flawed because the court failed to consider how the Kawaiisu interpreted the Treaty, as the Supreme Court requires." However, "[t]he interpretation of a treaty is a question of law and not a matter of fact." *United States ex rel Chunie v. Ringrose*, 788 F.2d 638, 643 n.2 (9th Cir. 1986); *see also Sioux Tribe v. United States*, 205 Ct. Cl. 148, 158 (Ct. Cl. 1974) ("We have repeatedly held that the interpretation of an Indian treaty is a question of law, not a matter of fact."). As in *Chunie*, the issue of whether the Treaty with the Utah granted any enforceable rights is relatively settled as a matter of law.

[7] The district court and Tejon Defendants point out that the Kawaiisu were partially compensated for the failure of the United States to ratify Treaty D. A 1942 settlement negotiated by Earl Warren, then-Attorney General of California, obtained over five million dollars in compensation

1851's requirement that any parties claiming title to land in California under Spanish or Mexican grants present their claims to the Commission.

Subsequent case law established that the Act of 1851 fully extinguished any existing aboriginal title or unregistered land grants. In 1901, the Supreme Court held in *Barker v. Harvey*, 181 U.S. 481, that even perfect title was subject to the presentation requirement of the Act of 1851, as were claims by Mission Indians derived from Mexican land grants. *Id.* at 491 ("If these Indians had any claims founded on the action of the Mexican government they abandoned them by not presenting them to the commission for consideration."). The Court further suggested that the Act itself extinguished aboriginal title: "Surely a claimant would have little reason for presenting to the land commission his claim to land, and securing a confirmation of that claim, if the only result was to transfer the naked fee to him, burdened by an Indian right of permanent occupancy." *Id.* at 492.

This construction was applied to extinguish aboriginal title in California. *Super v. Work* extended the rationale to nomadic, non-Mission Indians. *See* 3 F.2d 90 (D.C. Cir.

---

for "the Indians of California" for the federal government's failure to ratify eighteen treaties with Native Americans, including Treaty D. *See Indians of California by Webb v. United States*, 98 Ct. Cl. 583 (Ct. Cl. 1942). This litigation was made possible by an Act of Congress in 1928 granting jurisdiction to the court of claims to hear such cases. The Indians of California Act, 25 U.S.C. § 651. The Court of Claims determined that the Act granted a right of action for an equitable claim, not a legal one, "allowing all the Indians of California to recover the amount specified in these unratified treaties, both in the value of the land promised to be set aside and the other compensation provided." *Indians of California*, 98 Ct. Cl. at 598.

1925), *aff'd per curiam*, 271 U.S. 643 (1926). We declined to create an exception to the "extensive reach" of the Act for the indigenous occupants of the Santa Barbara Islands. *See United States ex rel. Chunie v. Ringrose*, 788 F.2d 638, 646 (9th Cir. 1986) (holding that the Treaty of Guadalupe Hidalgo did not convert tribe's aboriginal title into recognized title and that its aboriginal title was extinguished by its failure to present its claim under the Act of 1851).

The Supreme Court in *United States v. Title Insurance & Trust Co.*, 265 U.S. 472 (1924), applied the rule to a dispute involving one of the very land patents at issue in this case. Despite the condition placed on an 1843 Mexican land that the Tejon Mission Indians would be allowed to continue to reside there under the protection of the grantees, the Court held that the land patent issued pursuant to the grantees' presentation to the Commission under the Act of 1851 "passed the full title, unincumbered [sic] by any right in the Indians" to occupy and use the lands. *Id.* at 482. The Court's opinion emphasized the especial importance of repose in matters involving land, where titles are "purchased on the faith of their stability." *Id.* at 487 ("Doubtful questions on subjects of this nature, when once decided, should be considered no longer doubtful or subject to change." (internal quotation marks and citation omitted)).

Thus, the district court correctly concluded that the Tribe has no cognizable ownership interest in the Tejon Ranch.

B

The Tribe also complains about numerous acts of alleged forgery and deception on the part of Edward F. Beale and others in obtaining patents for the four Mexican land grants

comprising Tejon Ranch. On this basis, the Tribe contends that Tejon Ranch Defendants' title—acquired, ultimately, from Beale's patents—is defective. However, all the alleged acts occurred prior to the  submission of the claims to the Commission pursuant to the Land Claims Act of 1851. The Commission confirmed all four of the claims, and at least one of the patents has survived a challenge in court. *See United States v. Title Ins. & Trust Co.*, 288 F. 821 (9th Cir. 1923), *aff'd*, 265 U.S. 472 (1924). The district court, pointing to the value of stability identified by the Supreme Court in *Title Insurance*, 265 U.S. at 484, concluded that "Plaintiffs cannot now challenge the validity of United States issued land patents after over a century of time has elapsed."

IV

The Tribe also claims that it owns a 49,000-acre subset of Tejon Ranch, known historically as the Tejon or Sebastian Reservation ("Reservation"), alleging that a reservation reserved to the Tribe was established pursuant to the Act of 1853. The Tribe claims that the Reservation, once established, was never terminated and that it possesses superior title to the parcel. The district court properly rejected the claim.

The Tribe argues that the Reservation was created pursuant to the Act of Congress of 1853 and that it survived a subsequent Act of Congress of 1864. In support of its claim, the Tribe cites two letters from the months immediately following the passage in 1853: one from President Franklin Pierce to Interior Secretary Robert McCelland, and a second from Secretary McClelland to Edward F. Beale, Superintendent of Indian Affairs for California and Nevada. While these letters certainly establish that the President

directed his officers to execute a plan for creating reservations in California, that plan lacks specificity and there is no evidence that the President ever approved the creation of the Tejon Reservation. Thus, the district court properly concluded that it "was not a reservation established by the President and therefore cannot provide legal rights to plaintiffs."

Further, any rights that the Tribe possessed were extinguished by the Act of 1864, which superseded the Acts of 1853 and 1855 by allowing only four reservations in California. *Shermoen v. United States*, 982 F.2d 1312, 1315 (9th Cir. 1992). *Mattz v. Arnett*, 412 U.S. 481 (1973), articulates a relatively high standard for Congressional termination of an Indian reservation: "A congressional determination to terminate [an Indian reservation] must be expressed on the face of the Act or be clear from the surrounding circumstances and legislative history." *Id.* at 505. The district court properly rejected the Tribe's claims of ownership in the Reservation.

V

The Tribe's claims against Kern County are contingent upon the establishment of ownership in the Tejon Ranch. Because its ownership claim fails, so do its claims against Kern County. Robinson's individual claims against Kern County are waived for failure to present a "specific, cogent argument for our consideration" on appeal. *Greenwood*, 28 F.3d at 977.

## VI

The district court properly determined that the Tribe has no ownership interest in the Tejon Ranch and that no reservation was established. The claims against Kern County are subsumed into the ownership determination. The claims originally asserted against the Secretary, along with Robinson's individual claims, were waived for failure to assert on appeal. We decline to consider the Tribe's new arguments on appeal. We need not reach any other issue urged on appeal.[8]

**AFFIRMED.**

---

[8] The Tejon Ranch Defendants and Kern County contend that we lack jurisdiction, arguing that our Appellate Commissioner erroneously granted the Tribe's motion to reinstate the appeal. A motions panel of our court has already considered, and rejected, these arguments, and we conclude the Appellate Commissioner acted within his discretion in granting the reinstatement motion.